**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Walter TARLOWSKI, Defendant.**

**Nos. 68–CR–278, 183.**

United States District Court
E. D. New York.

Aug. 4, 1969.

Vincent T. McCarthy, U. S. Atty., Brooklyn, N. Y., for plaintiff; Stuart B. Stillman, of counsel.

William Esbitt, New York City, for defendant.

## REVISED MEMORANDUM

WEINSTEIN, District Judge.

In this prosecution for failure to file income tax returns (26 U.S.C. § 7203), defendant Walter Tarlowski seeks to suppress certain statements and records obtained from him during the course of an investigation by agents of the Internal Revenue Service (IRS). For the reasons stated below the motion is granted.

### I. FACTS

On January 4, 1965, Special Agent John Trager, accompanied by an IRS Revenue Agent, interviewed the defendant at the home-office of his accountant,

Michael Coppins. This interview with the two agents lasted slightly over one-half hour, and was preceded by a separate, shorter interview with Coppins. In his interview, the defendant made several damaging admissions.

Although the testimony of Special Agent Trager is self-contradictory on this point, it seems likely, and this Court finds, that he requested Coppins to leave the room while Tarlowski was being interrogated. This finding is buttressed by the uncontroverted facts that Coppins did leave, and that he had no other apparent reason to leave the room in which the questioning took place: his records and papers were kept in that room; he was obviously accustomed to working in that room; his client, in whom he had a natural interest, with whose difficulties he was familiar, and for whom he had arranged the interview at the request of Agent Trager, was being interviewed in that room.

It is clear that before proceeding with the questioning, the Special Agent gave Tarlowski some of the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), including the warning of the right to counsel. Yet, while he was informing the prospective defendant of his right to counsel, he was simultaneously requesting that the defendant's accountant leave during the interrogation. In effect, the investigator informed Tarlowski that he might have his attorney present, but not his accountant.

After this meeting, there were no further contacts between the defendant and Trager until July 31, 1967. At about that time, the Special Agent was informed by Coppins, who had continued negotiations for Tarlowski, that his client had engaged another accountant, John Dolan. Wishing to secure copies of worksheets for Tarlowski's 1963 and 1964 tax returns, as well as his ledger book, Trager waited outside the defendant's home until his return in the early evening of July 31. When Tarlowski arrived, Trager and another Special Agent spoke with him in the driveway outside

his home. Trager was again informed that Dolan was to be the defendant's accountant, and that Tarlowski intended to meet with Dolan that evening or the next to turn over all his materials and discuss the matter. Special Agent Trager then requested that the defendant turn over his work sheets and ledger book and informed him of his rights to silence and counsel. Tarlowski gave Trager the requested materials. Although he had "almost made [his] mind up to recommend criminal prosecution," the Special Agent did not then inform Tarlowski of this possibility.

Again, in effect, by proceeding when the defendant had expressed his desire to consult with his accountant, the Special Agent denied him the right to the assistance of anyone other than his attorney. Although Tarlowski had specifically expressed his intention to seek advice, the agent informed him of his rights in the same formalistic manner, brushed aside the defendant's attempts at an explanation, and proceeded with his inquiries, thereby conveying the impression that the right to seek advice was not available except through an attorney. This conclusion takes on added weight in view of the facts that defendant is a man of limited education, and that the Special Agent was aware of the defendant's background.

One other factual aspect of the case is relevant. A deliberate and conscious attempt was made throughout the course of the IRS investigation to deceive and mislead the defendant into the belief that he was the subject of only a civil litigation. This defendant had earlier cooperated on a friendly basis with the same agent in the investigation of another person. That investigation was clearly labeled criminal. It is reasonable to conclude that in the absence of such a label, the defendant believed that the Agent was conducting a civil investigation. This conclusion is reinforced by the Agent's conscious policy not to "frighten" taxpayers from the start, and the fact that there was at the time no difference between the identification of

Revenue (civil) and Special (criminal) Agents.

■ The questions presented in this case are troublesome. Putting to one side the situation where there is statutory authorization, may a representative of the federal government, at his own behest, limit the right of an individual to demand the presence of others at an interrogation? May such a representative, contemplating a criminal prosecution, demand the presence of an individual for questioning, but, at the same time, refuse that person the right to be accompanied by another in whom he reposes trust and confidence? The answers to these questions are no; there is no authority for a federal official's so limiting freedom. This conclusion is compelled by general constitutional principles as well as by the specific command of the Fifth Amendment that no person shall be deprived of liberty without due process of law. Two elements must be considered in this context: what constitutes an infringement upon constitutionally guaranteed liberties; and what is the due process of law which will permit such an infringement?

## II. CONSTITUTIONALLY PROTECTED LIBERTY

■ Certain fundamental liberties, not expressly enumerated in the Constitution or Bill of Rights, are, nonetheless, guaranteed to the individual by the requirement of due process. *See, e. g.,* Loving v. Virginia, 388 U.S. 1, 12, 87 S. Ct. 1817, 1824, 18 L.Ed.2d 1010 (1967) (right to marry); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L. Ed.2d 510 (1965) (right to privacy in intimate marital relationship); Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (right to travel); Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) (same); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (rights to conduct and attend private schools); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (rights to teach and learn foreign languages). *Cf.* United States v. Carolene Products Co., 304 U.S. 144, 152, n. 4, 58 S.Ct. 778, 783, n. 4, 82 L. Ed. 1234, n. 4 (1938). In order to determine the existence and extent of those rights, not expressly enumerated, that are encompassed in the term "liberty" some source of content for the term must be sought.

■ The standards of interpretation of the Fifth Amendment are threefold. First, a fruitful source of inquiry may be "the common and statute law of England prior to the emigration of our ancestors, and * * * the laws of many of the states at the time of the adoption of this amendment. * * *" Murray's Lessee v. Hoboken Land & Improvement Co., 18 How. (59 U.S.) 272, 280, 15 L.Ed. 372 (1855). Another source of interpretation is the entire Bill of Rights (and, too, provisions in the body of the Constitution enunciating basic protections of individuals). Twining v. New Jersey, 211 U.S. 78, 99, 29 S.Ct. 14, 19–20, 53 L.Ed. 97 (1908); Griswold v. Connecticut, 381 U.S. 479, 484, 85 S.Ct. 1678, 1681 (1965). A third field of inquiry is, of course, the intent of the Framers of the Constitution, to be ascertained by an examination of the document as a whole, as well as by an analysis of the legislative history. McCulloch v. Maryland, 4 Wheat. (17 U.S.) 316, 406–407, 4 L.Ed. 579 (1819); United States v. Classic, 313 U.S. 299, 315–316, 61 S.Ct. 1031, 1038, 85 L.Ed. 1368 (1941). *See also* People v. Fancher, 50 N.Y. 288, 291–292 (1872) (on interpretation of constitutions generally).

### A. *Pre-Adoption History*

■ Under the common law the powers of state agents were limited and the requirement for an arrest warrant was strictly enforced. 4 W. Blackstone, Commentaries *289–*295. *See also* 1 M. Hale, Pleas of the Crown 578–90 (1736); 4 E. Coke, Institutes 176 (1797 ed.). Searches, as part of the process of investigation, were also frowned upon.

*See* 16 Hansard, Parl. Hist. Eng. 207–210 (1813) (debates 1766).

In Entick v. Carrington, 19 How.St.Tr. 1030, 1044 (1765), Lord Chief Justice Camden, speaking for the court, noted that if the searcher, a government official, admits the trespass,

> he is bound to shew by way of justification, that some positive law has empowered or excused him. The justification is submitted to the judges who are to look into the books; and if such a justification can be maintained by the text of the statute law, or by the principles of common law. If no such excuse can be found or produced, the silence of the books is authority against the defendant and the plaintiff must have judgment [in trespass]. *Id.* at 1066.

The fact that many would not challenge the wrongful exercise of power by a government official cannot, by prescription, validate improperly claimed authority. As Lord Chief Justice Camden pointed out in *Entick:*

> there has been a general submission of guilt and poverty to power and the terror of punishment. But it would be strange doctrine to assert that all the people of this land are bound to acknowledge that to be universal law, which a few criminal booksellers have been afraid to dispute.
> *Id.* at 1077.

We have found no exact precedent or close analogy to the question presented in this case at common law. This is not surprising in view of the radical changes which have taken place in the functions of peace officers, as well as in the nature of crimes, in the near two centuries since the adoption of the Constitution. United States v. Wade, 388 U.S. 218, 224, 87 S.Ct. 1926, 1931, 18 L. Ed.2d 1149 (1967) ("When the Bill of Rights was adopted, there were no organized police forces as we know them today. The accused confronted the prosecutor and the witnesses against him, and the evidence was marshalled, largely at the trial itself."). *See also* Moylan, Temple Bar to Megalopolis, 53 Judicature 22 (1969) (changing nature of crimes).

Some cases dealing with related issues do establish the right of individuals to be free of unauthorized actions by investigators. Entick v. Carrington, 19 How. St.Tr. 1030 (1765) dealt with a search by general warrant before arrest or trial —in what might be called the investigatory stage. One of the grounds relied upon in holding invalid the action of the officers involved was the violation of the right against self-incrimination which such a seizure entailed. In effect, the rights against warrantless searches and self-incrimination were held to run together at some point before the formal criminal processes were instituted, and to constitute an additional limitation upon the investigatory power of the state.

In Wilkes' Case, 19 How.St.Tr. 981 (1763), the report of Mr. Serjeant Wilson indicates that a writ of habeas corpus was issued by the Court of Common Pleas upon receipt of the information that Wilkes was detained in his own home pending a search of the premises under a general warrant. Before that writ could be served, custody over Wilkes was transferred and a new writ was issued. It was upon this confinement that the decision of the case rested. The issuance of this first writ, however, would indicate the distaste felt for infringement of individual liberties in the course of an investigation. In fact, "[t]he lord chief justice Pratt [of the Court of Common Pleas] was pleased to say that this was a most extraordinary warrant. \* \* \*" Id. In the report of the case, the point was also made that Wilkes was denied not only the right to see his attorney and friends, but "particularly · his own brother \* \* \* *ut audivi.*" Id. at 982.

The failure of such a case as is now presented to arise at common law gives strength to the inference that if the right to question a person incommunicado were asserted at all, it was done only infrequently. In view of the extended definition given to the word "lib-

erties" in Chapter 39 of the Magna Charta: "the freedomes, that the subjects of England have," (2 E. Coke, Institutes 47 (1797 ed.)), a case attacking such a denial of the right of access and association with others before formal arrest would appear to have had a good chance of success.

It would be absurd to deny that the Crown frequently acted unilaterally to deprive the individual of his fundamental liberties. But this, in large part, is what the struggle for the supremacy of law in the course of English constitutional history was all about. See, e. g. The King v. John Hampden (1638) (The Ship-Money Case), in Stephenson & Marcham, Sources of English Constitutional History 459 (1937); Act Abolishing the Kingship (1649), in Id. at 521; Bill of Rights (1689), in Id. at 599; Declaration of Independence, in Perry & Cooper, Sources of our Liberties 319 (1959).

That the term "liberty" meant more than freedom from imprisonment to the early Americans can also be seen by the use of the word in the state constitutions adopted between 1776 and 1790. Article XXI of the Maryland Constitution of 1776 reads:

> that no freeman ought to be taken, or imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty, or property, but by the judgment of his peers, or by the law of the land." 1 Z. Chafee, Documents on Fundamental Human Rights 212 (1963).

To the same effect, that an express distinction is made between freedom from imprisonment and other invasions of individual freedom embodied in the word "liberty," see also, e. g., South Carolina Constitution, Article IX(II) (1790); (id. at 233); Massachusets Constitution, Article XII (1780) (id. at 240). Cf. New Hampshire Constitution, Article XV (1784) (see also Article XIX, which requires arrest warrants for both examination and trial). Id. at 222.

From this early history it seems clear that the right of an individual to be free of restraints upon his freedom to do as he wills—absent some common law or legislative inhibition—was recognized and jealously guarded. The laissez faire reaction to mercantilism was particularly strong in this country at the political level—if not at the economic level— when the federal constitution was adopted. The clearest expression of this concept is perhaps in the Ninth Amendment: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

It would seem likely, then, that the intentional exclusion of a witness to the interview conducted by the IRS Special Agents would have been thought to be a limitation of the rights of free men and of the concept of liberty recognized when the Constitution was written.

## B. *Specific Constitutional Provisions*

Among the large number of individual rights guaranteed by the federal Constitution are those against unreasonable searches and seizures and self-incrimination and those affirming the rights to counsel and to habeas corpus. These rights have two characteristics in common: all extend to aid the individual in extra-judicial contact with government; all are directed to the preservation of the "right to be exempt from all unauthorized, arbitrary or unreasonable inquiries and disclosures in respect of [the people's] personal and private affairs." Sinclair v. United States, 279 U.S. 263, 292, 49 S.Ct. 268, 271, 73 L.Ed. 692 (1929). *See also* Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L. Ed. 746 (1886); Brown v. Walker, 161 U.S. 591, 596–597, 16 S.Ct. 644, 646–647, 40 L.Ed. 819 (1896); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678 (1965); Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967).

The Fifth Amendment right against self-incrimination is one of those basic and fundamental rights

which may shed light upon the meaning of "liberty." It has long been held to be applicable to events before trial. *See, e. g.,* Brown v. Walker, 161 U.S. 591, 16 S. Ct. 644 (1896) (grand jury investigation). *See also* E. Griswold, The Fifth Amendment Today 55 (1955). Compulsion in any form is strictly forbidden; only voluntary revelations may be used and then only where appropriate safeguards have been employed to guarantee voluntariness. Miranda v. Arizona, 380 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); United States ex rel. Stephen J. B. v. Shelly, 305 F.Supp. 55 (E.D.N. Y.1969). This right to silence is absolute; even where the warnings required by Miranda v. Arizona, *supra,* are not mandated, the right may not be infringed. ALI, Model Code of Pre-Arraignment Procedure § 2.01(1) and comment at 28–29 (Tent. Draft No. 2, 1969). *See also* Terry v. Ohio, 392 U.S. 1, 34, 88 S. Ct. 1868, 1886, 20 L.Ed.2d 889 (1968) (White, J. concurring).

■ The purpose of this guarantee against compulsory self-incrimination was not only to secure uncoerced, and therefore more credible, testimony (Jackson v. Denno, 378 U.S. 368, 383, 84 S.Ct. 1774, 1784, 12 L.Ed.2d 908 (1964)); among the reasons which have been advanced is the desire to enable "the citizen to create a zone of privacy which government may not force him to surrender to his detriment" (Griswold v. Connecticut, 381 U.S. 479, 484, 85 S.Ct. 1678, 1681 (1965); *see also* Tehan v. United States ex rel. Shott, 382 U.S. 406, 416, 86 S.Ct. 459, 465, 15 L.Ed.2d 453 (1966)). *See,* for other bases of the rule, 8 Wigmore, Evidence § 2251 (McNaughton rev. 1961).

■ The Fourth Amendment prohibition against unreasonable searches and seizures is unique in that it clearly indicates that it is intended to operate on official conduct outside the scope of judicial or criminal proceedings. This amendment is designed to protect the right of the individual citizen from unwarranted intrusions by governmental agents. Katz v. United States, 389 U.S. 347, 350, 88 S.Ct. 507, 510 (1967).

■ The right to the assistance of counsel, guaranteed by the Sixth Amendment, is largely designed to secure to the accused a fair trial, "to assure that the accused's interests will be protected consistently with our adversary theory of criminal prosecution." United States v. Wade, 388 U.S. 218, 227, 87 S.Ct. 1926, 1932 (1967). But this is not the only purpose of that protection offered by the Constitution. One reason for the guarantee is to enable an individual "with the whole power of the state against him," to defend against the loss of personal liberty. Powell v. Alabama, 287 U.S. 45, 69, 72, 53 S.Ct. 55, 64, 65, 73 L.Ed. 158 (1932). Another is to insure that other fundamental rights secured to the individual will receive adequate and effective enforcement. *Id.*; Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966); Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

Before extensive use was made of the right to counsel as an aid to the effective enforcement of the right against self-incrimination, several cases grounded a finding of involuntary self-incrimination upon the refusal of law enforcement officials to permit access to relatives or friends. Haynes v. Washington, 373 U.S. 503, 514, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963); *see also* United States ex rel. Caminito v. Murphy, 222 F.2d 698, 701 (2d Cir. 1955); *cf.* Fay v. Noia, 372 U.S. 391, 396, n. 2, 83 S.Ct. 822, 825, n. 2, 9 L.Ed.2d 837 (1963).

A final element relevant in classifying those restraints upon individual liberty prohibited by the Fifth Amendment, in the absence of due process of law, is the standard applied in determining whether there is custody for purposes of the writ of habeas corpus under section 9 of Article 1 of the Constitution. 28 U.S.C. § 2241. The writ has been granted, or custody sufficient to justify the exercise of jurisdiction has been found, for restraints which constitute far less than the word "custody" ordinarily implies.

Jones v. Cunningham, 371 U.S. 236, 237–40, 83 S.Ct. 373, 374–75, 9 L.Ed.2d 285 (1963) (petitioner on parole required to request permission "to leave the community, to change residence, or to own or operate a motor vehicle"); United States v. Jung Ah Lung, 124 U.S. 621, 8 S.Ct. 663, 31 L.Ed. 591 (1888) (alien refused permission to land in United States); Nash v. Purdy, 283 F. Supp. 837 (S.D.Fla.1968) (petitioner's commitment stayed by state trial court); Foster v. Gilbert, 264 F.Supp. 209 (S.D.Fla.1967) (petitioner released into custody of his own attorney); Walker v. North Carolina, 262 F.Supp. 102 (W.D.N.C.1966), *aff'd on other grounds,* 372 F.2d 129 (4th Cir.), *cert. denied,* 388 U.S. 917, 87 S.Ct. 2134, 18 L.Ed.2d 1360 (1967) (sentence suspended on condition that petitioner comply with municipal housing codes constitutes a restraint not shared by public generally); Varga v. Rosenberg, 237 F.Supp. 282 (S.D.Calif.1964) (petitioner free on bond pending deportation); Reis v. United States Marshal, 192 F.Supp. 79 (E.D.Pa.1961) (petitioner released on bail pending habeas corpus determination); Petition of Phillips, 167 F.Supp. 139, 140 (S.D.Calif.1958) (petitioner, an enlistee in Marine Corps, who was not "subjected to any disciplinary action of any kind, and * * * under no restraint except those which the usual requirements of military life may impose"); United States ex rel. Altieri v. Flint, 54 F.Supp. 889, 892 (D.Conn. 1943), *aff'd,* 142 F.2d 62 (2d Cir. 1944) (inducted petitioner, not yet in active service, "subject to military call and hence subject to a restraint upon the otherwise unrestricted course of conduct open to him").

■■■ From this brief review of the decisions under the Fourth, Fifth and Sixth Amendments, as well as those under the habeas corpus provision of the Constitution, it can readily be seen that any significant interposition of government power against the individual, restricting his liberties, must be based upon clear authority. The guarantees of these provisions set up a system which assures the individual that he will not, be taken or disseized of his liberties without due process of law. Insofar as these provisions overlap, they provide a guarantee of the right of the individual to be let alone by the state, to do or not to do as he sees fit.

## C. *Intent of the Framers*

These conclusions are reinforced by the obvious intent of the Framers of the Constitution. As originally drafted, the Constitution contained no guarantees of individual liberties. It was the belief of those who gathered in Philadelphia that no such guarantees were necessary because they were incorporated in the very marrow of the new federal government. The Federalist, No. 84, at 439 (Everyman's Lib. ed. 1961) (A Bill of Rights "would contain various exceptions to powers not granted; and, on this very account, would afford a colourable pretext to claim more than were granted."). Some, of course, disagreed with this view. *See, e. g.,* Col. George Mason of Virginia, 2 M. Farrand, Records of the Federal Convention of 1787, at 637 (1937).

The ratification debates centered, in part, around this very lack of a Bill of Rights. M. Kraus, the United States to 1865, at 260–63 (1959); *see also, e. g.,* 2 J. Elliot, Debates 102–03 (1888).

Madison, believing that the omission of a Bill of Rights was not "a material defect," expressed the opinion that such an addition might be acceptable, "provided it be so framed as not to imply powers not meant to be included in the enumeration." Letter from Madison to Jefferson, October 17, 1788, reprinted in 1 L. Pollack, The Constitution and the Supreme Court 121 (1966). Jefferson replied shortly thereafter, urging the adoption of a Declaration of Rights as a bar against the unauthorized usurpation of power by the executive and legislature. Letter from Jefferson to Madison, March 15, 1789, reprinted in *id.* at 123.

To overcome some of his—and others'—doubts, Madison not only introduced

what later became the Bill of Rights in the First Congress, but also added the Ninth Amendment. In the debate, Madison referred to the objections raised in the Federalist and in his letter to Jefferson saying:

"It has been objected also against a bill of rights, that, by enumerating particular exceptions to the grant of power, it would disparage those rights which were not placed in that enumeration; and it might follow by implication, that those rights which were not singled out, were intended to be assigned into the hands of the General Government, and were consequently insecure * * * but, I conceive, that it may be guarded against. I have attempted it, as gentlemen may see by turning to the last clause of the fourth resolution [which later became the Ninth Amendment]." 1 Annals of Congress 456 (Debate June 8, 1789).

While the adoption debates indicate that the intention of the Framers of the Constitution was to reserve to the individual all rights which were not taken by the Constitution or by valid statute under the Constitution, these are not the only source of information on the intention of the draftsmen. Not only the pre-existing system in England, but also the then-current thoughts and attitudes must be taken into account. Perhaps one of the most influential legal or political theorists in the development of the political theory of the Eighteenth Century was John Locke. H. Cairns, Legal Philosophy from Plato to Hegel 336 (1949). In his Second Essay on Government Locke stated:

"The liberty of man in society is to be under no other legislative power but that established by consent in the commonwealth; nor under the dominion of any will or restraint of any law, but what the legislative shall enact according to the trust put in it." The English Philosophers from Bacon to Mill 411 (E. Burtt ed. 1939).

*See also id.* at 486:

"[W]hosoever in authority exceeds the power given him by the law, and makes use of the force he has under his command to compass that upon the subject which the law allows not, ceases in that to be a magistrate, and acting without authority may be opposed, as any other man who by force invades the right of another."

In his letter to the Sheriffs of Bristol, the conservative Edmund Burke, writing about the American Revolution, reflected the spirit of his times in part when he declared:

"Liberty, too, must be limited in order to be possessed. The degree of restraint it is impossible in any case to settle precisely. But it ought to be the constant aim of every wise public counsel to find out by cautious experiments, and rational, cool endeavors, with how little, not how much, of this restraint the community can subsist: for liberty is a good to be improved, and not an evil to be lessened. It is not only a private blessing of the first order, but the vital spring and energy of the state itself, which has just so much life and vigor as there is liberty in it." E. Burke, Selected Works 211 (W. J. Bate ed. 1960).

The concept of limited governmental action was at one of its peaks at the time of the adoption of the Constitution. A. Westin, Privacy and Freedom 330 (1967). At a period less than thirty years after the publication of Rousseau's *Contrat Social,* and less than fifteen after the ringing declaration of the rights of the individual in the Declaration of Independence, it is difficult to conceive of any interpretation of the first nine Amendments except in terms of limitations upon governmental authority. Given this historic background and design, the conclusion seems inescapable that the right to associate with others of one's own choice at any time is one of the liberties protected by the Fifth Amendment.

## III. NECESSITY FOR AUTHORIZATION

While many rights of the individual, even—to some undefined but limited extent—those which come within the language of the Bill of Rights, may be overriden by statute if a clear necessity for such legislative action exists (Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Zemel v. Rusk, 381 U.S. 1, 14, 85 S.Ct. 1271, 1279, 14 L.Ed.2d 179 (1965)), it is axiomatic that no federal official may limit a person's freedom without authority either clearly specified in a statute or plainly implied from constitutional or recognized common law sources. *See*, Aptheker v. Secretary of State, 378 U.S. 500, 518, 84 S.Ct. 1659, 1670, 12 L.Ed.2d 992 (1964) (Black, J. concurring) ("neither the Secretary of State nor any other government agent can deny people in this country their liberty to travel or their liberty to do anything else except in accordance with the 'law of the land' as declared by the Constitution or by valid laws made pursuant to it."); Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *see also* R. Pound, The Development of Constitutional Guarantees of Liberty 61 (1957); H. Black, A Constitutional Faith 32 (1968).

At a very early date it was recognized that:

"Every oppression against law, by colour of any usurped authority is a kind of destruction, for, *quando aliquid prohibetur, prohibetur et omne, per quod devenitur ad illud*: and it is the worst oppression, that is done by colour of justice." 2 E. Coke, Institutes 48 (1797 ed).

In light of the subsequent discussion by Blackstone of the right of each individual against "destruction" by the state, this observation takes on added significance. *See* 1 W. Blackstone, Commentaries *121–*134, especially at *133 ("Which words, '*aliquo modo destruatur*, [chapter 39 of Magna Carta].—according to Sir Edward Coke, include * * * every oppression by color of an illegal authority.").

Grants of police authority beyond that allowed by the common law in "border line" areas have been closely defined, and promulgated through specific legislative action. One example is the permission granted by New York (Code of Criminal Procedure, § 799) and other states to police officers executing search warrants enabling them to enter the premises to be searched without announcing themselves. People v. De Lago, 16 N.Y.2d 289, 266 N.Y.S.2d 353, 213 N.E.2d 659 (1965), *cert. denied*, 383 U.S. 863, 86 S.Ct. 1235, 16 L.Ed.2d 305 (1966). Although the constitutional validity of state statutes authorizing temporary stops and examinations of individuals for weapons has been upheld (Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)), stringent limitations have been placed upon the exercise of such powers. Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed. 917 (1968). No case has upheld such an action by officers acting without express statutory authorization. Indeed, in *Sibron, supra*, the New York Court of Appeals upheld the constitutionality of the search there because it was authorized by statute, a fact noted by the Supreme Court in its opinion. *Id.* at 44 and 1893; People v. Sibron, 18 N.Y.2d 603, 272 N.Y.S.2d 374, 219 N.E.2d 196 (1966). In *Terry* it was suggested that "in the absence of state authority, policemen have no more right to 'pat down' the outer clothing of passers-by, or of persons to whom they address casual questions, than does any other citizen." Terry v. Ohio, 392 U.S. 1, 32, 88 S.Ct. 1868, 1885 (1968) (Harlan, J., concurring).

The refusal of the Supreme Court to countenance unauthorized wiretapping (Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)) has resulted in the passage of legislation au-

thorizing such activities in national security investigations, 18 U.S.C. § 2511(3), and otherwise strictly limiting police authorities in their use of electronic surveillance devices. 18 U.S.C. §§ 2511(1), 2515–2519. *See also* Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). Other infringements upon the freedoms of individuals without statutory authorization have also been rejected. *See, e. g.,* Union Pacific Ry. Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891) (district court order for physical examination of party in civil action held invalid in absence of authorization; "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.").

■ No statutory authorization provides the basis for the decision of the Special Agent to exclude the defendant's accountant from his interviews with the defendant. The Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. § 3501) does not purport to allow such action; neither does it require the admission of statements obtained in violation of constitutional prohibitions. United States v. Schipani, 289 F.Supp. 43, 59–60 (E.D.N.Y.1968), *aff'd,* 414 F. 2d 1262 (2d Cir. 1969).

■ Basically, a Special Agent of the IRS is a peace officer, and in the exercise of his duties he is subject to the same limitations imposed upon all peace officers by the Constitution and the federal statutes. The only Congressional action which treats of the powers of IRS officers is section 7608 of title 26 of the United States Code. The relevant functions of the ordinary Special Agent, not charged with enforcement of the narcotics tax laws, are threefold: to search and arrest pursuant to warrant and issue subpoenas and summonses; to arrest without warrants in certain circumstances; and to seize property forfeitable under the internal revenue laws.

In the absence of applicable federal statutes, the extent of an agent's authority depends largely upon the statute or common law of the state. Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948). The duties of an agent include the powers to investigate and arrest. United States v. Viale, 312 F.2d 595 (2d Cir. 1963), ·cert. denied, 373 U. S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1964); see ALI, Model Code of Pre-Arraignment Procedure, §§ 2.01, 2.02, 3.01, and comment at 28–29, 54–66 (Tent. Draft No. 2, 1969). But, as noted above, the extent to which the common law limited these powers was great. These limitations certainly continue in the absence of state statutes. We have found no such statute.

## IV. CONCLUSION

■ The only determination that may be reached is that an invasion of the individual's right to determine the conditions under which he will deal with agents of the federal government when under criminal investigation, as is present here, can be considered to be nothing less than a denial of liberty without due process of law. When an agent of the IRS or any administrative body acts on his own authority to set the limits of an individual's power to associate, this constitutes an invasion of the liberties guaranteed by the due process clause. "Liberty" and "due process" do not mean solely freedom from imprisonment or mere procedural regularity after a conviction has been assured by extra-judicial activity. R. Pound, The Development of Constitutional Guarantees of Liberty 109 (1957). An invasion of these other liberties, underlying and preexisting the Constitution, must also be condemned, and the fruits of such an invasion must be excluded.

This conclusion is reinforced by a consideration of the functions of accountants retained by people seeking aid in their relationship with tax collectors. To many laymen like the defendant, an

accountant is relied upon for legal advice and protection. Suits involving unauthorized practice of law and claimed accountant-client privileges as well as the policies of the IRS itself are indicia of this dependence. *See, e. g.,* In re Bercu, 273 App.Div. 524, 78 N.Y.S.2d 209 (1st Dep't 1948), *aff'd,* 299 N.Y. 728, 87 N.E.2d 451 (1949); Lowe v. Presley, 86 Ga.App. 328, 71 S.E.2d 730 (1952); State Bar Ass'n of Connecticut v. Connecticut Bank & Trust Co., 146 Conn. 556, 153 A.2d 453 (1959); Falsone v. United States, 205 F.2d 734 (5th Cir. 1953); Baird v. Koerner, 279 F.2d 623, 95 A.L.R.2d 303 (9th Cir. 1960); United States v. Kovel, 296 F.2d 918 (2d Cir. 1961); 31 C.F.R. §§ 10.3, 10.7 (1969). *Cf.* Proposed Rules of Evidence for the United States District Courts and Magistrates, Rule 3–02(a) (2) (1969).

 While in this circuit at least, a prospective defendant not in custody and in non-official surroundings needs no *Miranda* warning before being questioned, United States v. Squeri, 398 F.2d 785 (2d Cir. 1968), he cannot be told that he has no right to counsel or other witnesses to the interrogation. *See* Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). For a government official to mouth in a ritualistic way part of the warning about the right to counsel while excluding the person relied upon as counsel, is, in effect, to reverse the meaning of the words used. The communication was the act not the language. It said clearly: "I am a government official with badge and identification. Tell me and give me what I want. Do not have your adviser with you."

 From the course of the investigation conducted by Special Agent Trager, outlined above, it is clear that a deliberate effort was made by the IRS to elicit information from the defendant while leaving him in ignorance of the status of the case. The defendant was lulled into a false sense of security, and, at the same time, he was denied the full assistance of his accountant when such assistance would have been most helpful to him in awakening him to the danger of prosecution. The numerous factors leading to this conclusion need not be rehearsed; suffice it to say that the defendant, a poorly educated individual laboring under the delusion that he was merely negotiating a civil claim, was continued in this belief by the actions of the IRS agents. At the time of his second meeting with the defendant, Agent Trager had almost made up his mind to recommend prosecution, yet, he continued the investigation on the same informal basis as he had in conducting the earlier interrogation more than two years before. Since the conduct of the investigators intentionally lulled the defendant into a false sense of security, misleading him in his estimate of the intentions of the IRS, the motion to suppress must be granted on this ground insofar as all documents and statements obtained at the second conference are concerned. United States v. Prudden, 305 F.Supp. 110 (M.D.Fla.1969); United States v. Lipshitz, 132 F.Supp. 519 (E.D.N.Y.1955); Goodman v. United States, 285 F.Supp. 245 (C.D.Cal.1968); *see also* Gouled v. United States, 255 U.S. 298, 305–306, 41 S.Ct. 261, 263–264, 65 L.Ed. 647 (1921); United States v. Como, 340 F.2d 891 (2d Cir. 1965); Alexander v. United States, 390 F.2d 101, 110 (5th Cir. 1969) ("Intimidation and deceit are not the norms of voluntarism. In order for the response to be free, the stimulus must be devoid of mendacity").

 Both interviews of the defendant, from which his accountant-advisors were excluded, were in violation of the rights of the defendant guaranteed by the due process clause of the Fifth Amendment. When a federal official's interference with the right of free association takes the form of limiting the ability of a criminal suspect to consult with, and be accompanied by, a person upon whom he relies for advice and protection, he gravely transgresses. Evidence obtained as a result of such a breach of national policy must be excluded. *See* Jackson v. Denno, 378 U.S. 368,

387, n. 14, 84 S.Ct. 1774, 1786, n. 14, 12 L.Ed.2d 908 (1964); Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L. Ed. 652 (1914); Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); United States v. Sohnen, 298 F.Supp. 51, 55–56 (E.D.N.Y.1969), and cases cited.

For these reasons, the motion to suppress must be granted.