**Nathan S. JACOBSON, Ronald Friedland, Richard F. Levy, Sandy Jacobson, Forrest Paull, Edward Jacobson, et al., Plaintiffs-Appellants,**

v.

**Robert ROSE etc., et al., Defendants-Appellees.**

**Nathan S. JACOBSON et al., Plaintiffs-Appellees,**

v.

**BELL TELEPHONE CO., OF NEVADA, Defendant-Appellant.**

**Nathan S. JACOBSON, et al., Plaintiffs-Appellees,**

v.

**Robert ROSE, etc., et al., Defendants-Appellants.**

Nos. 77–1196, 77–1210, 77–1314.

United States Court of Appeals, Ninth Circuit.

Nov. 29, 1978.

Rehearing Denied in No. 1196 March 21, 1976.

Wright, Handbook of the Law of Federal Courts § 7, at 17–18 (3d ed. 1976).

Thomas R. Sheridan (argued), of Simon & Sheridan, Los Angeles, Cal., for plaintiffs-appellants, cross-appellees.

Anthony S. Warburg (argued), of Porter, Scott, Weiberg & Delehant, Sacramento, Cal., Noble K. Gregory (argued), of Pillsbury, Madison & Sutro, San Francisco, Cal., for defendants-appellees, cross-appellants.

Before CHOY and KENNEDY, Circuit Judges, and SCHNACKE *, District Judge.

CHOY, Circuit Judge:

Appellants brought suit against certain officials of Washoe County, Nevada, and Bell Telephone Company of Nevada, seeking civil damages for an allegedly illegal wiretap pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2520. Appellants claim that the district court improperly limited its award to them. The Washoe County officials and Nevada Bell cross-appeal, claiming that the district court impermissibly failed to instruct the jury on certain defenses. We affirm in part, and reverse and remand in part.

I. *Statement of the Case*

In September, 1971, the Washoe County Sheriff's Department and District Attorney's Office sought a court order authorizing wiretapping of certain telephone lines at the Kings Castle Hotel and Casino, pur-

---

* The Honorable Robert H. Schnacke, United States District Judge for the Northern District of California, sitting by designation.

portedly to uncover information concerning a possible kidnapping at Kings Castle. On September 20, 1971, District Attorney Rose obtained an "Order for the Authorization to Intercept Wire Communications"[1] from a state judge. The order specified that it would terminate thirty days from its date. The order also "requested" that Nevada Bell "cooperate in every respect" with the government officials. Upon receiving a copy of the order, Nevada Bell requested that a more precise order be drafted apparently to ensure compliance with applicable law. Rose and his deputy, Hicks, redrafted the order in cooperation with Nevada Bell, obtaining court approval of the revised order on September 29, 1971. The second order set the period of authorized interception as thirty days from the date of the original order of September 20.[2]

Benham, Chief Deputy of the Sheriff's Department and the individual responsible for effecting the wiretap, learned of the issuance of the second order. Without seeing the order but having been told of its contents he assumed that the second order provided for interception for thirty days from the signing of the second order. After preliminary work by Nevada Bell and after encountering technical difficulties, Benham and other sheriff's officials succeeded in making the intercept operational on October 18, 1971. Benham closed down

the intercept on October 29, 1971, thirty days after the signing of the second order. The wiretaps provided no information useful in investigating the alleged kidnapping.

In May, 1972, Jacobson and others whose conversations were allegedly wiretapped filed a class action suit for recovery of statutory liquidated damages (not actual damages), attorney's fees, and costs, as provided in § 2520.[3] Having denied class action status, the district court on April 10, 1975, granted plaintiffs leave to amend their complaint to add as plaintiffs other individuals whose conversations were allegedly overheard. On October 17, 1975, a stipulated pretrial order was filed in which plaintiffs' claim was stated to be for statutory liquidated damages, no mention being made of actual damages. After extensive discovery, a jury trial commenced. On the second day of the trial, appellants unsuccessfully sought leave to amend their complaint to ask for actual damages.

At the close of the defense's case, the district court directed verdicts against defendants Rose, Hicks, Benham, and Galli, Sheriff of Washoe County, as to statutory liquidated damages. The district judge gave to the jury the claims for statutory damages against Nevada Bell, Butner, a lieutenant with the Sheriff's Department, and Whitmire, a deputy sheriff.[4] The

---

1. The order read in part:

 This authorization is granted to the Washoe County Sheriff's Office and the Washoe County District Attorney's Office, and it is requested that Bell Telephone Company cooperate in every respect with these agencies in effectuating these interceptions. This authorization shall terminate in thirty days from the date of this order.

2. The second order read in part:

 This order will terminate when the communications concerning threats to Ray Melvin Landucci or others and the admissions between the individuals involved in this kidnapping which identify such individuals have been intercepted. Even if such communications are not intercepted, this order shall terminate thirty (30) days from the original order, which is dated September 20, 1971.

3. Section 2520 provides:

 Any person whose wire or oral communication is intercepted, disclosed, or used in viola-

tion of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and (2) be entitled to recover from any such person—

(a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

(b) punitive damages; and

(c) a reasonable attorney's fee and other litigation costs reasonably incurred.

A good faith reliance on a court order or legislative authorization shall constitute a complete defense to any civil or criminal action brought under this chapter or under any other law.

4. The amended complaint also included claims against Jensen and Adamson, employees of the Sheriff's Office. The court dismissed the claims against Jensen, apparently because he died before judgment. The court also granted

judge also instructed the jury on punitive damages as to Rose, Hicks, Galli, and Benham. The judge refused to give defendants' proposed instruction setting forth a defense based on good faith reliance on a court order, concluding that "[t]here is no way you can misinterpret an order that you have never seen." The court also refused to instruct the jury as to prosecutorial immunity for Rose and Hicks, "finding that the attorney defendants were not acting as attorneys."

Though not awarding punitive damages, the jury found Butner, Whitmire, and Nevada Bell liable for statutory damages. The jury awarded the statutory maximum, $1000, against each of the seven defendants. The court later determined that defendants' liability should be joint and several and not individual. It therefore reduced the award to $1000 for each plaintiff as against all seven defendants jointly, for a total judgment of $12,000. The court also awarded $12,000 in attorney's fees pursuant to § 2520(b). The court clerk awarded costs to plaintiffs.

## II. *Appellants' Claims*

### A. *Leave to Amend*

Appellants assert that the district judge abused his discretion in refusing to allow them to amend their complaint to seek actual damages.

■ "It is settled that the grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); *Waters v. Weyerhaeuser Mortgage Co.*, 582 F.2d 503, 507 (9th Cir. 1978); *Komie v. Buehler Corp.*,

449 F.2d 644, 647 (9th Cir. 1971).[5] The Supreme Court has instructed that in exercising its discretion the trial court should consider the potential prejudice to the other parties. *Zenith Radio*, 401 U.S. at 330–31, 91 S.Ct. 795. We have also noted that delay in seeking an amendment is a common reason for refusing leave. *Komie*, 449 F.2d at 647–48. For example, in upholding a district judge's refusal to allow an amendment regarding agency to pleadings and the pretrial order, we wrote:

> Here there were "justifying" reasons [for rejecting the amendment] which were readily apparent. The motion was made 31 months after the answer was filed, eleven months after the pretrial statement was signed, and more than six months after the case was set for trial. There had been extensive discovery none of which had been directed to [the issue sought to be added]. The proposed amendment was not based upon any facts which were not known or readily available to the defendants and their counsel, at least when the pretrial statement was signed.

*Id.* at 648. *See Waters*, 582 F.2d at 507.

■ In the instant case the plaintiffs' motion to amend came on the second day of trial, two months after the trial court had ordered the close of discovery, some 50 months after the action was filed, 15 months after the filing of the first amended complaint, and nine months after the filing of the pretrial order. Not based on any newly-revealed material facts, the amendment would have interjected an entirely new issue into the trial. Following *Komie* and *Waters*, we conclude that the district court did not abuse its discretion in refusing to allow the proposed amendment.[6]

---

summary judgment in favor of Adamson. These rulings are not before this court.

5. Because a pretrial order had already been filed, the introduction of the claim for actual damages would require amendment to the pretrial order. We have noted that as with amendments to pleadings, "[a]bsent a showing of clear abuse of discretion by the district judge . . . the exercise of such discretion under Rule 16 [providing for amendment of pretrial

orders] will not be disturbed on appeal." *Angle v. Sky Chef, Inc.*, 535 F.2d 492, 495 (9th Cir. 1976).

6. Appellants refer to cases dealing with amendment pursuant to Rule 15(b) of pleadings to conform to proof accepted at trial through tacit consent of both parties. *E. g., Rosden v. Leuthold*, 107 U.S.App.D.C. 89, 91, 274 F.2d 747, 750 (1960). Appellees here, however, contested the introduction of such nonconforming

### B. *Punitive Damages*

██ Appellants next contend that the trial judge erred in restricting its instruction on punitive damages to certain defendants. We have noted, however, that "[n]o error is committed by failure to give an instruction which finds no support in the evidence." *Southern Pacific Co. v. Villarruel*, 307 F.2d 414, 415 (9th Cir. 1962). *See Bechtel v. Liberty National Bank*, 534 F.2d 1335, 1342 (9th Cir. 1976). In order to receive punitive damages under § 2520, appellants must show that defendants acted wantonly, recklessly, or maliciously. *Halperin v. Kissinger*, 434 F.Supp. 1193, 1195 (D.D.C.1977). *See Scott v. Donald*, 165 U.S. 58, 86–89, 17 S.Ct. 265, 41 L.Ed. 632 (1897); *Lake Shore & Michigan Southern Railway Co. v. Prentice*, 147 U.S. 101, 106–07, 13 S.Ct. 261, 37 L.Ed. 97 (1893). Having reviewed the record, we think the district court limited the instruction as to punitive damages in accord with the evidence proffered. We refuse to accept appellants' claim that the events surrounding the wiretapping, of themselves, manifest the necessary wantonness, recklessness, or maliciousness.

### C. *Joint Liability*

Appellants next claim that the language in § 2520 providing that an aggrieved individual shall "be entitled to recover from any such person" who illegally wiretaps indicates that Congress intended recovery for liquidated damages to be against each defendant individually and not jointly.

██ Appellants' interpretation is inconsistent with the language and purpose of § 2520. Section 2520 provides that the victim shall "be entitled to recover from any such person" actual or liquidated damages, punitive damages, reasonable attorney's fees, and costs. If "any such person" means that liability is individual, then a plaintiff could recover actual or liquidated damages in a § 2520 action in excess of actual loss. Indeed, the amount of recovery would depend on the number of defendants named. This result does not comport with the common understanding that these types of damages are intended to reimburse a plaintiff for his losses and not to provide a windfall against multiple defendants. *See Scott*, 165 U.S. at 86–89, 17 S.Ct. 265; *Lake Shore*, 147 U.S. at 107, 13 S.Ct. 261. In the absence of a clear congressional direction, we cannot attribute to Congress a purpose to disregard this common understanding.

██ Appellants' reading also ignores the explicit congressional allowance of punitive damages under subsection (b) of § 2520. Punitive damages are traditionally designed to punish and deter and thus may exceed the aggrieved party's actual loss. *Scott*, 165 U.S. at 86–89, 17 S.Ct. 265; *Lake Shore*, 147 U.S. at 107, 13 S.Ct. 261; Prosser on Torts § 2, at 9 (4th ed. 1971).[7] If actual or liquidated damages are multiplied by the number of defendants, such damages would exceed actual loss and become punitive in nature, rendering the provisions for punitive damages superfluous. Generally, we will not read a statute to render language superfluous. *See Pettis ex rel. United States v. Morrison-Knudsen Co.*, 577 F.2d 668, 673 (9th Cir. 1978); *Hart v. McLucas*, 535 F.2d 516, 519 (9th Cir. 1976).[8]

██ Finally, appellants' reading is also inconsistent with the congressional goal of providing a civil remedy to victims whose

---

proof, and thus any amendment would have to be made pursuant to the provisions of Rule 15(a).

**7.** This unique function of punitive damages suggests that in a proper case we might determine that § 2520 does require awards of punitive damages against defendants individually and not jointly.

**8.** Appellants cite *Ljepava v. M. L. S. C. Properties, Inc.*, 511 F.2d 935, 945 (9th Cir. 1975),

where we held that civil penalties under the Truth in Lending Act should have been awarded individually against each promisee. As noted above, however, the purpose of allowing recovery for actual or liquidated damages is to compensate for loss and not to provide a penalty. Moreover, in *Ljepava* there were ten separate promissory notes while in the present case appellants complain of just one wiretapping. *See* 511 F.2d at 939.

privacy has been unlawfully invaded by wiretapping. S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 2112, 2156. Without clear language to the contrary, we must assume that in providing a federal remedy for invasion of privacy through wiretapping, Congress intended to follow the traditional rule limiting compensatory damages for tortious invasion of personal rights to actual loss. *See* Prosser at 9.[9] In short, the district court properly awarded damages jointly. *See Halperin*, 434 F.Supp. at 1196.[10]

### D. Costs

Pursuant to Rule 54(d) of the Federal Rules of Civil Procedure, the clerk of the district court awarded costs to appellants and later reduced the award in response to appellees' contentions. Appellants now claim that the award should have been greater.

■ Although in a proper case this court may review the district court's allowance of costs, we have held that "[i]n the absence of a showing in the record that this matter was brought to the attention of the lower court . . ., this court has no power to review the ruling of the clerk . . . ." *Guffey v. Alaska & P. S. S. Co.,* 130 F. 271, 279 (9th Cir. 1904). Because the record does not indicate a request for district court review of the clerk's award, we will not review the award.

### E. Attorney's Fees

Section 2520(c) provides that an aggrieved party shall be awarded reasonable attorney's fees. Appellants requested that the district court award $40,000 while appellees suggested that $12,000 would be appropriate. After hearing counsel for both sides, the district court adopted the appellees' suggestion.

■ We have held that "[t]he amount of attorney's fees to be awarded is . . . within the discretion of the trial court and will not be disturbed absent an abuse of discretion." *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 69 (9th Cir. 1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). *See Moore v. Telfon Communications Corp.,* 589 F.2d 959 (9th Cir. 1978). Having reviewed the record, we cannot say that the district judge abused his discretion in adopting the appellees' suggestion after affording both sides an opportunity to be heard.[11]

---

9. Appellants assert that the deterrent effects of § 2520 would be enhanced were civil awards made individual rather than joint. Again we note that the purpose of providing for actual and liquidated damages is to compensate. Moreover, if greater awards are necessary to provide sufficient deterrence, that is a contention properly addressed to Congress and not this court.

10. The jury initially awarded plaintiffs $1000 against each defendant. The district judge later found the defendants jointly and severally liable and so reduced the award. Appellants argue that had the jury known that the compensatory award would be the lesser sum, they might have awarded punitive damages. The trial judge instructed the jury that it could award punitive damages if it found the necessary requisites such as wantonness, maliciousness, or oppressiveness. We must presume that the jury followed its instructions, *Gray v. Shell Oil Co.,* 469 F.2d 742, 752 (9th Cir. 1972), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973), and concluded that punitive damages were not appropriate under the facts of this case.

11. Appellants argue that the district judge improperly limited the award because he believed that he could not award attorney's fees in an amount greater than the judgment. The record indicates that counsel for appellees initially suggested the $12,000 figure as a "fair and reasonable attorney's fee," noting additionally that it was "actually the same as the judgment." After hearing counsel for both sides, the district judge adopted the $12,000 figure. Though he noted that he had not found cases where attorney's fees were awarded in an amount in excess of the judgment, he also pointed to other considerations like the complexity of issues and possible excesses by appellants' counsel, concluding:

> Weighing all the factors involved here, I agree with [counsel for appellees] that the sum of $12,000 for attorney fees would be reasonable and proper in this particular case.

We cannot say that the district judge abused his discretion.

**522**

### III. Appeal of Nevada Bell

#### A. Violation of Statute

Section 2520 provides for recovery against one who unlawfully "intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use" a wire or oral communication. Section 2510(4) defines "intercept" to mean the "aural acquisition of the contents" of a communication. Nevada Bell contends that because none of its employees actually listened to tapped conversations, it has not violated the statute.

We disagree. In enacting Title III Congress intended to establish sanctions that would deter illegal invasions of privacy through wiretapping. S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 2112, 2156. When many individuals together take the steps necessary for the recording of telephone conversations, the victim's privacy is violated, regardless of which particular individuals actually listen to the tapes. Additionally, we do not believe that Congress meant to allow those tapping phones to determine the possible scope of civil liability by their limiting who among them would listen to the tapes.

 This interpretation is reinforced by the traditional rule respecting concerted tortious acts—here the invasion of privacy. As Professor Prosser has explained:

Where two or more persons act in concert, it is well settled . . . that each will be liable for the entire result. . .

In legal contemplation, there is a joint enterprise, and a mutual agency, so that the act of one is the act of all, and liability for all that is done must be visited upon each.

Prosser § 52, at 314–15. Because Nevada Bell joined with the Washoe officials in the wiretapping, its failure to listen to the tapes should not insulate it from liability for the invasion of privacy it helped to occasion. *See White v. Weiss*, 535 F.2d 1067, 1071 (8th Cir. 1976); *Gerrard v. Blackman*, 401 F.Supp. 1189, 1190 (N.D.Ill.1975).[12]

We appreciate Bell's concern that it may be held liable for cooperating with the police at the request of the Nevada state court. But the proper response to that concern is not to emasculate the statute. Congress appreciated this potential dilemma and established a defense for good faith reliance on a court order. It is upon such a defense that Bell must rely.

#### B. Good Faith Defense of Nevada Bell

The district court should have instructed the jury on the good faith defense provided by § 2520 as to defendant Nevada Bell. Section 2520 reads in part:

A good faith reliance on a court order or legislative authorization shall constitute a complete defense to any civil or criminal action brought under this chapter or under any other law.

Congress established this defense in part "to protect telephone companies or other persons who cooperate under court order

12. Bell cites cases holding that the use of a pen register, which records the numbers to which calls are placed, does not fall within Title III. *E. g., Application of United States in re Order Authorizing Use of a Pen Register*, 538 F.2d 956, 958 (2d Cir. 1976), *cert. granted sub nom. United States v. N. Y. Telephone Co.*, 429 U.S. 1072, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977); *United States v. Illinois Bell Telephone Co.*, 531 F.2d 809, 812 (7th Cir. 1976). Unlike the instant case, however, Congress specifically indicated that Title III should not extend to pen registers. S.Rep. No. 1097 at 2178; *see Hodge v. Mountain States Tel. & Tel. Co.*, 555 F.2d 254, 257–58 (9th Cir. 1977). Moreover, while pen registers have been excluded from the scope of Title III because they do "not disclose the contents of any conversation," *United States v. Bowler*, 561 F.2d 1323, 1325 (9th Cir. 1977), the very purpose of wiretapping is to obtain the contents.

Bell also cites *United States v. Turk*, 526 F.2d 654 (5th Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976), where the Fifth Circuit held that there was no violation of Title III when police played tapes given to them by a suspect because the police had not been involved in the recording of the tape. In our case Bell was involved in the setting up of the recording devices. *See* 526 F.2d at 658 n.3. Equally inapposite is *Broadway v. City of Montgomery*, 530 F.2d 657 (5th Cir. 1976), where defendant-police officers had not even known of the wiretap until after the victim had found the tape recorder recording his conversations.

with law enforcement officials." 115 Cong. Rec. 37193 (1969) (Sen. Tydings).[13]

 Although § 2520 does not define "good faith," the Senate Report on the unamended version of § 2520[14] suggests an analogy to the good faith defense allowed in § 1983 cases. S.Rep. No. 1097 at 2196.[15] That defense obtains only if the defendant held a subjective belief which was objectively reasonable that he was acting legally. *See, e. g., Pierson v. Ray,* 386 U.S. 547, 555–57, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics,* 456 F.2d 1339, 1347–48 (2d Cir. 1972). Applying that formula to the § 2520 context, we hold that a defendant may invoke the defense of good faith reliance on a court order only if he can demonstrate (1) that he had a subjective good faith belief that he acted legally pur-

suant to a court order; and (2) that this belief was reasonable. *See Zweibon v. Mitchell,* 170 U.S.App.D.C. 1, 78, 516 F.2d 594, 671 (1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976); *Wright v. Florida,* 495 F.2d 1086, 1090 (5th Cir. 1974).

There was sufficient testimony at trial which if believed by the jury would establish that Nevada Bell held an honest and reasonable belief that it acted legally pursuant to a court order. The first court order specifically requested that Nevada Bell assist the Washoe officials.[16] There was testimony that upon receiving notice of the first order, Nevada Bell asked the Washoe officials to draft a supplemental order to ensure compliance with applicable law. The jury could have found that Nevada Bell completed its work on the wiretaps prior to the termination date of the two orders.

---

13. The debates included the following discussion:

> Mr. McCLELLAN. [W]e learned that a number of telephone companies were sincerely and seriously concerned that, should they cooperate with the Federal law enforcement officers, even though the officers were acting under court order, they might subject themselves to civil or criminal liability under State law.
>
> In enacting title III, it was our intention that good faith cooperation with law enforcement officers would be an *absolute defense* to civil or criminal liability, State or Federal.
>
> I recognize, however, that the language of title III on this point may be somewhat ambiguous
>
> Consequently, I should like now to offer an amendment that would make congressional intent . . . under title III of last year's act . . . unequivocal: that *good faith* cooperation by a telephone company or other individual with law enforcement officials would not subject such an individual or company to criminal or civil liability . . . .
>
> Mr. TYDINGS. . . . There is no question that the original legislative intent of title III of the Safe Streets Act of last year was to *protect telephone companies or other persons who cooperate under court order* with law enforcement officials.
>
> Mr. McCLELLAN. . . . It would be ridiculous for us to authorize electronic surveillance or wiretapping and then leave exposed to criminal or civil liability those who cooperate in good faith with the officers in carrying out an order of the court to make

such surveillance. It is on this basis, therefore, that I think the amendment is proper. 115 Cong.Rec. 37192–93 (1969). Senator McClellan's amendment is the amended version of the good faith defense cited above. *Id.* at 37193.

14. Congressional debate over the 1969 amendments to § 2520 indicate that the amendments were intended to clarify and not change the purpose and meaning of the original provisions. *See* note 13 *supra.*

15. The Report states:

> A good faith reliance on a court order would constitute a complete defense to an action for damages. (Compare *Pierson v. Ray,* 386 U.S. 547 [, 87 S.Ct. 1213, 18 L.Ed.2d 288] (1967)).

In *Pierson* plaintiffs brought an action under 42 U.S.C. § 1983 alleging that their arrest by police under a breach of the peace statute violated their civil rights. The Fifth Circuit held that the police could not assert a good faith defense under § 1983. 386 U.S. at 550, 87 S.Ct. 1213. Reviewing the rationale for the good faith defense, the Supreme Court disagreed:

> We hold that the defense of good faith and probable cause . . . is also available . . . under § 1983. . . . If the jury believed the testimony of the officers and disbelieved that of the [plaintiffs], and if the jury found that the officers reasonably believed in good faith that the arrest was constitutional, then a verdict for the officers would follow even though the arrest was in fact unconstitutional.

*Id.* at 557, 87 S.Ct. at 1219.

16. *See* note 1 *supra.*

And the jury could also have found that Nevada Bell acted reasonably and in good faith in assuming that the police would comply with the court order, thereby obviating the need for Nevada Bell to "police" the police.

■ We do not, of course, express any opinion as to whether a jury should find good faith on the part of Nevada Bell. We conclude only that there was testimony which if believed by a jury could warrant a finding that Nevada Bell acted in good faith reliance on a court order. Accordingly, we reverse and remand to the district court either to enter a judgment N.O.V. for Nevada Bell if it determines the record warrants such a ruling in light of this opinion or to allow Nevada Bell's good faith defense to go to the jury. *See Fountila v. Carter*, 571 F.2d 487, 489–90 (9th Cir. 1978); *Chisholm Brothers Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137, 1140 (9th Cir., *cert. denied*, 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974).

IV. *Appeal of Washoe Officials*

A. *Prosecutorial Immunity*

■ The district court correctly concluded that Rose and Hicks did not enjoy the quasi-judicial immunity against suit afforded prosecutors performing quasi-judicial functions. In *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Supreme Court held a prosecutor immune from a § 1983 suit when

respondent's activities were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force. We have no occasion to consider whether like or simi-

lar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate.

*Id.* at 430–31, 96 S.Ct. at 995 (footnotes omitted). Although the Supreme Court did not consider immunity for activities which are not quasi-judicial, this court has held that if the prosecutor "committed acts, or authoritatively directed the commission of acts, which ordinarily are related to police activity as opposed to judicial activity, then the cloak of immunity should not protect them." *Robichaud v. Ronan*, 351 F.2d 533, 537 (9th Cir. 1965).[17] *See Sykes v. California*, 497 F.2d 197, 200–01 (9th Cir. 1974).

The district judge found that Hicks and Rose acted in an administrative and not a judicial manner. He observed that they did not simply render legal advice to the Sheriff's office, but instead joined in implementing the wiretap. The district judge noted, for example, that the court order authorized wiretapping by the District Attorney's Office as well as by the Sheriff's Office. We believe that the district judge properly concluded that the *Imbler* immunity did not apply.

B. *Good Faith Defense of the Officials*

These appellees/cross-appellants claim that the district court erred in not instructing the jury on their good faith defense. They claim that they each acted in good faith upon either their own misreading of the court's orders (as allowing wiretapping for 30 days from issuance of the second order) or a fellow appellee's mistaken recounting of the contents of the order. They further argue that they each believed in good faith that a fellow appellee would

---

**17.** In affirming this court's decision in *Imbler v. Pachtman*, 500 F.2d 1301 (9th Cir. 1974), the Supreme Court wrote, referring to *Robichaud* and other decisions:

[T]he Court of Appeals emphasized that each of respondent's challenged activities was an "integral part of the judicial process." 500 F.2d, at 1302. The purpose of the Court of Appeals' focus upon the functional nature of the activities rather than respondent's status was to distinguish and leave standing those

cases, in its Circuit and in some others, which hold that a prosecutor engaged in certain investigative activities enjoys, not the absolute immunity associated with the judicial process, but only a good-faith defense comparable to the policeman's.

424 U.S. at 430, 96 S.Ct. at 995. We conclude below that the good faith defense of § 2520 does not apply to Rose and Hicks. *See* § IVB *infra*.

ensure compliance with the court orders so that they did not have to scrutinize its legality.

Earlier we noted that the good faith defense of § 2520 is available only if the defendant had a subjective belief which was objectively reasonable that he acted legally pursuant to a court order. *See* § IIIB *supra.* The district court refused to instruct the jury on the good faith defense because "[t]here is no way you can misinterpret an order that you have never seen." Except as to appellees Whitmire and Butner, we agree that under the circumstances of this case the appellees' belief was not reasonable.

The two court orders were emphatic and clear about the termination date for the wiretapping. The second order stated: "[T]his order shall terminate thirty (30) days from the original order, which is dated September 20, 1971." We do not believe that a jury could reasonably find that either an attorney or a police officer could reasonably misinterpret this order to allow wiretapping for thirty days from the date of the second order. Given the clarity of the orders, had others seen them, they could not have but noted the obvious misreading and prevented the illegal actions. We hold that it could not be found reasonable for Sheriff Galli or Chief Deputy Benham, the officer responsible for operation of the wiretap, not to have read the court order. To hold otherwise would compromise the congressional effort to prevent illegal wiretapping. *Cf. United States v. McIntyre,* 582 F.2d 1221, 1224 (9th Cir. 1978) (Title III "is full of references to law enforcement officers as targets of the legislation").

We think, however, that appellees Whitmire and Butner were entitled to have the jury instructed regarding their good faith defense. Whitmire was a deputy sheriff and Butner a lieutenant with the Sheriff's Department. They were not charged with primary responsibility for organizing and carrying out the wiretap. They were subordinates in the Sheriff's Department and in the wiretap operation. A jury might find that it was reasonable for such officers not to scrutinize a wiretap order which superiors have indicated is valid.

We must conclude that the evidence in this case would not support a finding that appellees (except for Nevada Bell, Whitmire, and Butner) had a reasonable belief that they were acting legally pursuant to a court order. The district judge therefore properly refused the good faith defense instruction. *See Bechtel v. Liberty National Bank,* 534 F.2d 1335, 1342 (9th Cir. 1976); *Southern Pacific Co. v. Villarruel,* 307 F.2d 414, 415 (9th Cir. 1962). As to appellees Whitmire and Butner, however, we conclude, as we did with regard to Nevada Bell, that a jury could find that they acted in good faith reliance on a court order. Thus, as to this issue we reverse and remand to the district court either to enter a judgment N.O.V. for Whitmire and Butner if it determines the record warrants such a ruling in light of this opinion, or to allow Whitmire's and Butner's good faith defense to go to the jury.

AFFIRMED in part, and REVERSED and REMANDED in part.