# Indemnification Agreements and the Anti-Deficiency Act

In order to comply with the Anti-Deficiency Act, 31 U.S.C. § 1341, indemnification agreements with government contractors, if otherwise authorized, must include a limitation on the amount of liability and must state both that the liability is further limited to the amount of appropriated funds available at the time payment must be made, and that the contracting agency implies no promise that Congress will appropriate additional funds to meet any deficiency in the event of loss.

A government agency may not indemnify its contractors for claims brought against them by reason of their own negligence. Nor may the United States agree in advance to assume liability for the negligence of its employees for which it may not otherwise be responsible under the Federal Tort Claims Act.

May 25, 1984

MEMORANDUM OPINION FOR THE DIRECTOR,
BUREAU OF PRISONS

This memorandum responds to your request for our opinion concerning the authority of the Bureau of Prisons (BOP) to enter into indemnification agreements. Specifically, you have sought our advice concerning two such agreements that you contemplate executing. The first would hold Telephone Company A harmless against any loss or injury arising from use of telephone monitoring equipment which you propose to have installed in a certain United States Medical Center for Federal Prisoners. The second would indemnify physicians on contract with the Medical Center against liabilities incurred as a result of their contract work. Factual and analytical distinctions between the two situations described lead us to reach different conclusions regarding them. We conclude that indemnification of contract physicians is not authorized, but that indemnification of Telephone Company A would be permissible if the scope of the agreement were significantly narrowed in the manner discussed below.

## I. Background

You have described to us a proposal to contract with Telephone Company A for service observing equipment to be placed on pay telephones available to inmates at the Medical Center. The purpose of procuring this service is to facilitate prison efforts to discover escape plots, schemes to introduce weapons and drugs into the institution, and other plans by inmates to violate the law. If the monitoring service is obtained, each telephone used by inmates will bear a

94

sign which advises that "use of institutional telephones constitutes consent to . . . monitoring," and that "[a] properly placed telephone call to an attorney [will not be] monitored." The Warden of the Medical Center has expressed the opinion that Title III of the Omnibus Crime Control and Safe Streets Act is not violated by the Bureau of Prison practices relating to this monitoring.[1]

Notwithstanding the assurances that all monitoring will be conducted in compliance with applicable law, Telephone Company A requires an indemnification agreement, signed by an authorized representative on behalf of the United States, before it will file the necessary tariff with the applicable Public Service Commission. The precise language requested by Telephone Company A is as follows:

> No liability shall rest on or be assumed by the Telephone Company in connection with the use or operation of the monitoring equipment, and by the acceptance of this monitoring equipment service, the subscriber agrees to indemnify and save the Telephone Company harmless from and against any and all claims, demands or liability on account of any or all injury, loss or damage to any person arising out of or in any manner connected with use of said equipment, or in the furnishing of said service and particularly against all claims, demands or suits which may arise or be claimed to have arisen out of any violation or claimed violation of any law respecting telephone and telegraph communications, privacy, electronic surveillance or eavesdropping.

We have less background material regarding the proposed indemnification of contract physicians working at the Medical Center against potential tort liability. We understand that fear of personal liability by physicians stands as an impediment to the Medical Center's ability to retain contract medical staff. BOP believes that indemnification would ease that burden.

## II. The Anti-Deficiency Act

At the outset, it appears that no statute expressly prohibits the execution of indemnity agreements on behalf of the United States. Nor does Article I, § 9, cl. 7 of the Constitution, which declares that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," foreclose the government from entering into such contracts. *See Cincinnati Soap Co.* v. *United States,* 301 U.S. 308, 321 (1937) (clause affects only power to make actual disbursements).

Two statutes, however, are generally relevant to the resolution of this issue. The Adequacy of Appropriations Act, 41 U.S.C. § 11, proscribes any contractual arrangement of the government "unless the same is authorized by law or is

---

[1] We have not been asked to comment on the accuracy of this legal conclusion and, because we have insufficient information upon which to evaluate this proposal, we express no views regarding its legality.

under an appropriation adequate to its fulfillment." We know of no law that would specifically authorize the contracts you propose. Similarly, the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1),[2] prohibits an employee of the United States from authorizing "an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation."[3]

The Comptroller General has issued a long series of opinions holding that the Anti-Deficiency Act is transgressed by any indemnity provision that subjects the United States to an indefinite, indeterminate, or potentially unlimited liability, because there could never be certainty that sufficient funds had been appropriated to cover all contingencies. *E.g.*, 59 Comp. Gen. 369 (1980); 35 Comp. Gen. 85 (1955); 16 Comp. Gen. 803 (1937); 7 Comp. Gen. 507 (1928). *Accord California-Pacific Utils. Co. v. United States*, 194 Ct. Cl. 703 (1971). Exceptions to this rule have developed, however.

First, the Comptroller General has upheld indemnity clauses when the potential liability of the United States was limited to an amount known at the time of the agreement and was within the amount of available appropriations. For example, an agency's promise, in lieu of paying substantial insurance costs, either to return a rented airplane to its lessor in good condition or to make good the loss was sustained by the Comptroller General on the grounds that the government's maximum liability would not exceed the value of the aircraft, the likelihood of loss was remote, and the agreement was financially advantageous to the government. 42 Comp. Gen. 708 (1963). No reservation or obligation of funds was required in this case. In our view, the indemnifications were upheld by the Comptroller General on these grounds only because the agency could make any conceivable expenditure required by the agreement without creating a deficiency in its appropriated funds. The information we have about your request leads us to believe that neither of the proposed indemnifications falls within this exception because they would create open-ended potential liability for the United States.

The Comptroller General subsequently overruled a portion of the earlier opinion to the extent that it did not require the agency to obligate or reserve funds sufficient to meet the contingent liability. This opinion permitted government assumption of risk for damage to contractor-owned property used predominantly in performance of government contracts. 54 Comp. Gen. 824, 826 (1975). The government was thus able to avoid paying the contractor's high insurance premiums. The opinion emphasized that such a contract is permissible only if it states clearly that government payments will not exceed appropriations available at the time of loss, and that the contract should not be deemed to imply that Congress will appropriate funds to meet deficiencies. *Id.* at 827. These two provisos appear to be mandated by the Anti-Deficiency Act. If the government's potential liability is rendered both limited and determin-

---

[2] This section, formerly 31 U.S.C. § 665(a), was enacted into positive law and reworded to some extent. Pub. L. No. 97–258, 96 Stat. 923 (1982). Congress did not, however, intend to make any substantive changes in the statute. Pub. L. No. 97–258, § 4, 96 Stat. 1067 (1982); H.R. Rep. No. 651, 97th Cong., 2d Sess. 3 (1982).

[3] Hereafter, both statutes will be referred to collectively as the Anti-Deficiency Act.

able, the agreement to indemnify for property damage will be permissible, assuming it is otherwise authorized.

Another exception was recognized by the Comptroller General to allow the General Services Administration to agree to indemnify a public utility service for injury or damage not caused by the utility company. 59 Comp. Gen. 705 (1980). The factors enumerated in the opinion include the following:

> (1) The contractor was a state-regulated utility which was a virtual monopoly; no other source was available for the needed services;

> (2) The tariff requirements were applicable generally to all of the same class of customers, so no danger of discriminatory treatment of the Government existed;

> (3) The restrictions were part of a tariff imposed after administrative proceedings in which the Government had an opportunity to participate;

> (4) The GSA had procured power in the past under tariffs containing the indemnity clause;

> (5) The possibility of loss was remote; and

> (6) The restrictions were non-negotiable.

The extent of this exception was limited when the Comptroller General held that the Architect of the Capitol could not agree to indemnify a utility company for losses resulting from its performance of tests on equipment installed in government buildings. Two factors distinguished this case from the earlier one: the Architect had an alternative source for the needed service, and he had not previously accepted the services or agreed to the liability represented by the proposed indemnity agreements. Comp. Gen. Op. B-197583 (Jan. 19, 1981).

Although it appears that some of the factors identified are present in the proposed agreement with Telephone Company A, the Comptroller General has construed the exception so narrowly that we believe the absence of any one of the criteria could be dispositive. Thus, for example, the availability of an alternative source for the monitoring service, the possibility of discriminatory treatment of the government, or absence of a longstanding tariff requirement could, in our judgment, remove the indemnification from the scope of this limited exception.

Finally, exceptions to the Anti-Deficiency Act have been created by statute. For example, 50 U.S.C. § 1431 permits the President to authorize contracts without regard to other provisions of contract law whenever he deems such action would facilitate the national defense, subject to certain limitations. Similarly, the Atomic Energy Act contains authority for exemptions from contract law. *See* 42 U.S.C. § 2202. We are aware of no such statutory exemp-

tion from the constraints of the Anti-Deficiency Act that would apply to the situation at issue here.[4]

Based on the principles discussed above, we find no exception from the general prohibition against unlimited indemnification contracts that would relieve the two agreements you have proposed from the constraints of the general rule. In order to comply with the dictates of the Anti-Deficiency Act, the agreements must include a limitation on the amount of liability and must state both that the liability is further limited to the amount of appropriated funds available at the time payment must be made, and that the contracting agency implies no promise that Congress will appropriate additional funds to meet any deficiency in the event of loss. These limitations are necessary if an agreement is to pass muster under the Anti-Deficiency Act.

## III. Other Considerations

Whether a qualification rendering the liability definite and limited would be sufficient to validate the proposed agreements depends on the agency's authorization to make the kind of payments contemplated by the agreements. The Comptroller General has held, for example, that the National Gallery of Art had no authority to use appropriated funds to pay the claims of its employees for injuries caused by a contractor's negligence. The Gallery's agreement to indemnify its contractor for such claims was, therefore, ruled invalid. Comp. Gen. Op. B-137976 (Dec. 4, 1958). The assumption of liability for claims arising out of tortious actions of Telephone Company A would be a similar promise to pay the debts of a contractor, which may not be justifiable under a "necessary expense" theory.[5] Consequently, we believe that the prison could not agree to indemnify Telephone Company A for losses resulting from the Company's own tortious acts and the agreement must be narrowed to exclude any obligation to indemnify the Company for this type of loss.

The same infirmity exists in the indemnification of physicians, if the physicians are considered contractors: an agency may not indemnify its contractors for claims brought against them by reason of their own negligence. If, however, the physicians are considered employees rather than contractors, the agreement

---

[4] This Office previously provided an opinion in which we addressed the applicability of the Anti-Deficiency Act to an agency's agreement to assume certain responsibilities for administering a national vaccine program, containing a measure of damages should the agency fail to meet those delineated responsibilities. Upon the agency's assurances that it was fully able and willing to perform its contractual duties without exceeding its appropriations, we concluded that the Anti-Deficiency Act did not apply: "the Anti-Deficiency Act does not require the Government's contracting officers to speculate without bounds as to the monetary consequences of a breach." Letter to William H. Taft, IV, General Counsel, Department of Health, Education, and Welfare, from Leon Ulman, Acting Assistant Attorney General, Office of Legal Counsel 7 (July 11, 1976). In contrast, the agreement you have proposed does not create merely a measure of damages, but provides a substantive allocation of liability.

[5] 31 U.S.C. § 1301 requires that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." Although this provision does not require that every item of expenditure be specified in the appropriation act, the discretion of the spending agency is limited to expenses "necessary or proper or incident" to a specified object. 6 Comp. Gen. 619, 621 (1927) (interpreting former 31 U.S.C. § 628).

is still impermissible, but on different grounds. The United States may be sued directly for certain torts committed by its employees acting within the scope of their employment. 28 U.S.C. § 2675. Thus the United States could be held liable, in court proceedings, for the negligence of its employees. That possibility does not, however, affect the ability of the United States to agree in advance to assume liability for acts of its employees for which it might not otherwise be responsible under the Federal Tort Claims Act (FTCA). An employee sued in his or her individual capacity, for example, generally may not be reimbursed by the United States. Comp. Gen. Op. B-152070 (Oct. 3, 1963). Attempts have been made to amend the FTCA to allow indemnification of employees in this situation, *e.g.*, H.R. 24, 97th Cong., 1st Sess. (1981); S. 1775, 97th Cong., 1st Sess. (1981), but those bills have never passed. Thus the physicians, whether considered contractors or employees, may not be indemnified by the prison.

The remaining matter to be addressed is that portion of the proposed contract with Telephone Company A which purports to indemnify the company for claims arising out of the wrongful acts of federal employees in intercepting telephonic communications. In early opinions of the Comptroller General, the rule against indemnifications was bolstered by another principle, in addition to those discussed above. Agencies were prohibited from taking on tort liability by contract because the United States was not otherwise liable for the tortious conduct of its employees. "It is well settled that the United States is not responsible for the negligence of its officers, employees, or agents and such liability cannot be imposed upon it by an attempt on the part of the contracting officer to make it a part of the consideration of the contract." *E.g.,* 16 Comp. Gen. 803, 804 (1937); 7 Comp. Gen. 507, 508 (1928). Although the passage of the FTCA rendered the United States liable for many tortious acts of its employees, 28 U.S.C. §§ 2671–2680, the circumstances under which such liability would attach were carefully tailored by Congress.[6] We believe, therefore, that the principle quoted above still precludes the contractual assumption of tort liability, particularly since application of the FTCA to any specific set of facts could not be certain in advance of judicial determination.[7]

There are certain precautions that BOP could take to protect the telephone company, however. Under Title III of the Omnibus Crime Control and Safe Streets Act, for example, which prohibits certain types of electronic surveillance, an aggrieved person may seek civil damages against any "person" who violates the title. 18 U.S.C. § 2520. The statutory definition of "person" excludes the United States, but includes government employees and private corporations. 18 U.S.C § 2510(6). The Supreme Court has held that a district

---

[6] 28 U.S.C. § 2674 provides that "[t]he United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances." Thus it is possible that state law could provide a remedy for invasion of privacy or the like, which the FTCA would make applicable to the United States

[7] Indemnification for government-caused property damage, the subject of early Comptroller General exceptions to the anti-indemnification rule, is distinguishable because such a government "taking" of property, if not compensated, would be actionable under the Fifth Amendment to the Constitution in the Court of Claims. 28 U.S.C. § 1491 (1982). Such liability is not predicated upon the operation of the FTCA and its monetary extent is generally ascertainable by mere evaluation of the property.

court may order a telephone company to assist in legitimate law-enforcement surveillance operations. *United States* v. *New York Tel. Co.,* 434 U.S. 159, 178 (1977). Such a court order provides the telephone company with a good-faith defense to a Title III action. 18 U.S.C. § 2520; *Jacobson* v. *Rose,* 592 F.2d 515, 522 (9th Cir. 1978), *cert. denied,* 442 U.S. 930 (1979). Congress established the defense in part "to protect telephone companies who cooperate under court order with law enforcement officials." 115 Cong. Rec. 37193 (1969). A court order requesting the assistance of Telephone Company A might provide the telephone company with the protection it seeks.

Finally, the Bureau of Prisons could assume liability for damage to property owned by Telephone Company A and used in performance of its government contract. 54 Comp. Gen. 824 (1975). Such an agreement would have to state clearly that no obligation is assumed in excess of appropriated funds available at the time of collection, and that no promise is to be inferred to the effect that Congress will appropriate additional funds to meet deficiencies. *Id.* at 827.

## Conclusion

Whether BOP may enter into an indemnification agreement with Telephone Company A will depend upon the company's willingness to limit the scope of the government's potential liability. If the contract were altered to require the United States to assume liability only for losses arising from property damage caused by the government, we believe the BOP would not contravene the Anti-Deficiency Act or other restrictions by agreeing to it. Appropriate clauses, as explained above, would have to be included to ensure that no obligations in excess of appropriations were created. As the indemnification provision now reads, however, we conclude that it could result in incurring obligations beyond BOP's appropriations and authorization, and therefore its execution would be prohibited by the Anti-Deficiency Act. The agreement with contract physicians is barred altogether by operation of the Anti-Deficiency Act and the Federal Tort Claims Act.

ROBERT B. SHANKS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*