**James MARTIN et al.,
Plaintiffs-Appellants,**

v.

**Mario MEROLA, District Attorney, Bronx County, et al., Defendants-Appellees.**

**No. 1024, Docket 75-7113.**

United States Court of Appeals,
Second Circuit.

Argued June 19, 1975.
Decided Feb. 5, 1976.

Henry B. Rothblatt, New York City (Rothblatt, Rothblatt, Seijas & Peskin and Andrew P. Zweben, New York City, on the brief), for appellants.

Robert M. Cohen, Asst. Dist. Atty., New York City (Mario Merola, Dist. Atty., Bronx County, New York City, on the brief), for appellees.

Before LUMBARD, GIBBONS,* and GURFEIN, Circuit Judges.

PER CURIAM:

This appeal raises important questions as to the scope of a prosecutor's immunity to suit. The six plaintiffs, all of whom were indicted in Bronx County in August 1974, on one or more felony charges arising out of an alleged loan-sharking operation,[1] in-stituted this damage action under 42 U.S.C. § 1983 alleging, inter alia, that their constitutionally guaranteed right to a fair trial had been infringed by the action of the defendants, Mario Merola, District Attorney of Bronx County, and two of his assistants, in announcing to the press the arrest of the plaintiffs and asserting that they were "linked directly to Mafia Crime Families," and "vultures" . . . "tied . . strongly . . . with Tramunti Crime Families." Plaintiffs appeal from a January 23, 1975 order of the Southern District granting defendants' motion for summary judgment.[2]

Each of the six plaintiffs was arrested on August 7, 1974, after warrants had issued on the sealed indictments returned by the Bronx County grand jury in July and August, 1974. Their complaint sets out in considerable detail the circumstances of the arrest and confinement of Carmine Apuzzo and Angelo Leonardi, alleged to be oppressive in view of police knowledge that each of these individuals suffered from serious and debilitating diseases.[3] We find it unnecessary to deal with these allegations in the absence of any indication that the three appellees were personally involved in the conduct complained of.[4] *Johnson v. Glick*, 481 F.2d 1028 (2d Cir. 1973).

Appellants, however, further assert that appellees issued press releases to various

---

* United States Circuit Judge for the Third Circuit, sitting by designation.

1. Carmine Apuzzo was indicted, with three others on July 19, 1974, for third degree conspiracy and criminal usury.

 James Darienzo, a/k/a James Martin, Angelo Leonardi, and Carmine Lavia were indicted, also on July 19, for fourth degree conspiracy and tampering with a witness.

 James Darienzo (James Martin) was further indicted on July 31 for felonious possession of a weapon.

 James Darienzo (James Martin), Angelo Leonardi, Ronald Darienzo, Bruce Doak, Carmine Lavia, and one other, were indicted on August 2 for third degree conspiracy and thirteen counts of criminal usury.

2. The district court's summary judgment decision was restricted to defendants Merola, Darcy and Chesler, all prosecutors in Bronx County. It did not affect plaintiff's action against

six police officers, also named as defendants in the complaint. On January 23, 1975, Judge Brieant granted, without prejudice, a motion to dismiss filed by the police officer defendants for failure of the complaint

> to set forth separately and with sufficient specificity to permit an informed responsive pleading, the facts relied on to show personal involvement by each defendant, stated separately, in order that the Court may ascertain what each such defendant did, and whether or not such conduct was within the limited immunity available to these movants.

Plaintiffs have since filed an amended complaint.

3. Apuzzo suffered from diabetes and terminal cancer. He has since died. Leonardi had undergone open heart surgery nine months prior to his arrest.

4. See note 2, supra.

news media regarding plaintiffs' arrest—a fact not denied by the appellees—and that these press releases violated appellants' 4th, 5th, 6th, 8th, 13th, and 14th Amendment rights. Newspaper clippings, annexed to an affidavit submitted by plaintiffs' counsel in response to defendants' motion for summary judgment, reveal the tenor of the news stories engendered by the district attorney's remarks. On August 9, 1974, the New York Times reported that:

> Mr. Merola said yesterday that the operation's ringleader was James Darienzo, 64 years old, of 2720 Seymour Ave., the Bronx. The District Attorney said he was "strongly connected with the Tramunti crime family."
>
> Another man indicted, Carmine Lavia, 43, of 2231 Treman Avenue, the Bronx, was said by Mr. Merola to be tied to the reputed crime family of Joseph S. Columbo, Sr.

The New York Post article included Merola's characterization of appellants as "vultures" and his comment that "[m]embers of this ring have been linked directly to the Tramunti and Columbo crime families." Similar accounts appeared in the New York Daily News and the Times Herald Record. Judge Brieant described these stories as "of a somewhat lurid and sensational nature."

In granting appellees' motion for summary judgment, Judge Brieant held that the doctrine of prosecutorial immunity barred the appellants from vindicating any possible violation of fair trial rights resulting from the alleged acts of the prosecutors. While recognizing that disclosure of the plaintiffs' purported criminal affiliations with "crime families" was arguably a failure to comply with the Fair Trial and Free Press Criminal Justice Standards of the American Bar Association,[5] and that it may have been a breach of the Code of Professional Responsibility adopted by the New York State Bar Association,[6] he concluded that such a "breach of prosecutorial responsibility does not amount to a 'deprivation of . . . rights, privileges, or immunities secured by the Constitution and laws,' 42 U.S.C. 1983." Judge Brieant added: "Apart from the right of the public to know, it would seem that the prosecutor should enjoy some right of free speech so as to permit him to account through the media to the voting public for his stewardship of his important public trust."

■ In view of our disposition of the appeal which results in a dismissal of the action without prejudice, we need not consider whether such a complaint, if and when it is again filed after the termination of the criminal proceedings, would state a claim for relief. Indeed, the dismissal of the complaint deprives the district court and this court of jurisdiction since there is no longer a pending case or controversy for the district court to manage. *Hawkins v. Town of Shaw*, 461 F.2d 1171, 1173 (5th Cir. 1972) (en banc).

■ Until the state prosecutions have been concluded, it is simply impossible to make any reasoned evaluation of plaintiffs' claim that they have been deprived of the opportunity to secure a fair trial by reason of the defendants' actions. Such a claim requires more than the mere speculation of damages contained in plaintiffs' complaint; it requires a showing that plaintiffs have in fact been denied their due process rights. *Rosenberg v. Martin*, 478 F.2d 520, 525 (2d Cir.), cert. denied, 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973). We do not know, nor can the parties now illuminate, whether an impartial jury may be selected. Cf. *Tunnell v. Wiley*, 514 F.2d 971 (3d Cir. 1975). Similarly, we can only guess as to the desirability of a change in venue or the feasibility of a continuance.

■ Moreover, even if such determinations were possible, it would offend the principle of comity for a federal district court to inquire into plaintiffs' ability to

---

**5.** The ABA Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press, Part II, § 2.1(1), proscribe the release by law enforcement officers, of information relating to a defendant's prior criminal record, character or reputation.

**6.** Judiciary Law, McKinney's Supp. 1975.

secure a fair trial in a pending state prosecution. See *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). That appellants herein have requested such an inquiry in the context of an action for damages rather than a suit directly to enjoin a state criminal proceeding is not determinative. See *Guerro v. Mulhearn*, 498 F.2d 1249 (1st Cir. 1974). In implementing the policy of non-interference, federal courts must focus upon the practical impact of any potential ruling. See *Samuels v. Mackell*, 401 U.S. 66, 73, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971). In addition, such parallel proceedings represent a drain on already overextended judicial and prosecutorial resources.

We believe the requirement that defendants wait until criminal proceedings have terminated before asking a federal court for damages against the prosecutor will tend to eliminate those suits which might be brought for purposes of harassment.

 Accordingly, we agree that plaintiffs' complaint must be dismissed on the basis that it is now premature. We do so without prejudice to its renewal at the conclusion of state criminal proceedings when the district court will be better able to assess the merits of plaintiffs' claims.[7]

Vacated and remanded to the district court with directions to dismiss the complaint without prejudice.

LUMBARD, Circuit Judge (concurring):

The question of prosecutorial immunity from accountability for public statements prejudicial to a defendant's right to a fair trial is one of such importance, and of such novelty in this circuit, that Judge Gibbons and I have felt that the action of the panel should, if possible, be unanimous. This is especially desirable where only one member

of the panel is an active circuit judge of this circuit.

The per curiam opinion speaks for all three of us in vacating the district court order and directing a dismissal of the complaint without prejudice to renewal after the state court criminal proceedings have been terminated. The per curiam leaves open for decision at such later time the question whether the complaint sets forth a cause of action under § 1983. Judge Gibbons and I believe that there are good reasons why a federal appellate court should express an opinion on this question at this time. We take this occasion to state the reasons why such a complaint should stand when brought after the conclusion of the state court proceedings.

 It is, of course, well settled that a prosecutor is "clothed with judicial immunity" from suit for actions taken in his official capacity, *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871); *Yaselli v. Goff*, 12 F.2d 396 (2d Cir. 1926), aff'd per curiam, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927); *Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950); *Scolnick v. Lefkowitz*, 329 F.2d 716 (2d Cir.), cert. denied, 379 U.S. 825, 85 S.Ct. 49, 13 L.Ed.2d 35 (1964), including civil suits for money damages brought under the Civil Rights Act. See *Palermo v. Rockefeller*, 323 F.Supp. 478, 485 (S.D.N.Y.1971). This immunity does not, however, protect the prosecutor against responsibility for his acts when they are clearly beyond the proper exercise of his authority and exceed any possible construction of the power granted to his office, *Gregoire v. Biddle*, supra, at 581. See also, *Robichaud v. Ronan*, 351 F.2d 533 (9th Cir. 1965); *Lewis v. Brautigan*, 227 F.2d 124

7. We note that, in the absence of any federal statute of limitations, § 1983 actions brought in New York State are governed by the three year period provided in CPLR § 214 for suits based on a statute. *Swan v. Board of Education*, 319 F.2d 56, 59 (2d Cir. 1963); *Romer v. Leary*, 425 F.2d 186 (2d Cir. 1970). The question of when a claim for relief accrues, however, remains one of federal law. *Kaiser v. Cahn*, 510 F.2d 282, 285 (2d Cir. 1974). As a corollary to today's decision that plaintiffs' complaint is presently premature, we hold that the statute of limitations should not begin to run until the completion of their criminal trial. In this manner, plaintiffs' claim that they have been deprived of the opportunity to secure a fair trial will be preserved until such time as the extent of their injury, if any, is capable of determination. Id.

(5th Cir. 1955); *Guerro v. Mulhearn*, 498 F.2d 1249 (1st Cir. 1974).

Taking the plaintiffs' allegations as true, as we must for purposes of evaluating their claims, we can see no reasonable need or excuse for issuing statements to the news media regarding any supposed connection of the plaintiffs with any "crime family" or "Mafia." It could in no way be relevant to the crimes charged against these plaintiffs by the Bronx County grand jury. Indeed, any such allegations made at trial of those indictments by the prosecutor would, in most circumstances, require reversal of any conviction.

█ It is, as Judge Brieant noted below, both the right and the duty of the prosecutor to advise the public, through the news media, of action taken by the grand jury, the names of those accused and the fact that they have been arrested. But, to go beyond this and allege that indicted persons are members of a "crime family" is tantamount to leading the public to believe the false and impermissible syllogism that because of the plaintiffs' purported membership in a criminal organization they therefore committed the crime for which they are presently charged. While any criminal affiliations of the plaintiffs may become relevant to their sentencing if and when they are convicted at trial, at the time of the press conferences held by the appellees, these plaintiffs were innocent in the eyes of the law. As Mr. Justice Frankfurter recognized long ago, he who occupies the prosecutorial office and "wields the instruments of justice wields the most terrible instruments of government."[1] It was the plaintiffs' constitutional right to have the prosecutor refrain from making any statements not relevant to their indictment and arrest which might prejudice their obtaining a fair trial.

█ Of course, the improper statements of the prosecutor do not necessarily render impossible the selection of an impartial jury; yet, they should not be excused solely on the ground that it may be possible to secure a fair trial by a change of venue or the grant of a continuance, or both. Such measures are merely necessary compromises with due process, such as the Sixth Amendment right to be tried in the vicinage where the alleged offense has been committed and the right to a speedy trial. Moreover, such remedies for prejudicial public statements place an extra burden on those charged with crime and an additional expense for counsel, travel and delay. To the extent that such expenses may be incurred by a criminal defendant in protecting against what a court determines to have been an infringement of his rights, we believe they should be recoverable in federal court in a suit under § 1983.

It is true that many of the earlier cases have seemed to say that the prosecutor's immunity is virtually absolute and that he may speak with impunity about an indicted defendant. Doubtless it is true that all too many prosecutors have acted on that assumption in times past. But at least by 1966 it had come to be recognized that improper pre-trial publicity endanger a fair trial and may constitute a denial of due process. In *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 60 (1966), decided in June of that year, Mr. Justice Clark noted in reversing a murder conviction that,

> unfair and prejudicial news comment on pending trials has become increasingly prevalent . . . Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to insure that the balance is never weighed against the accused. . . . Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures. 384 U.S. at 362–63, 86 S.Ct. at 1522.

In December 1966, the ABA Criminal Justice Standards on Fair Trial and Free Press, referred to by Judge Brieant, were

---

1. Letter to the New York Times, March 4, 1941.

promulgated and published.[2] See also, ABA Standards Relating to the Prosecution Function and the Defense Function, Part I, § 1.3, Comment, formulated by an Advisory Committee whose chairman was Warren E. Burger, then United States Circuit Judge. Shortly thereafter, in 1969, the ABA adopted the Code of Professional Responsibility.[3] Disciplinary Rule 7–107, included therein, precludes an attorney, from the time of filing of an indictment or issuance of an arrest warrant, from making any extrajudicial statements whose public dissemination is reasonably foreseeable and which relates to "the character, reputation or prior criminal record . . . of the accused." In accord, Report of the Commission on the Operation of the Jury System on the "Free Press-Fair Trial" Issue, 45 F.R.D. 391.

Whatever the law may have been prior to 1966, we are convinced that the shield of absolute immunity is today unavailable to a public prosecutor who acts beyond the scope of his official duties, *Gregoire v. Biddle,* supra at 581, and who knows or reasonably should know that his actions will deprive a criminal defendant of his constitutionally protected liberties, cf. *Bivens v. Six Unknown Named Agents,* 456 F.2d 1339, 1348 (2d Cir. 1972), on remand from the Supreme Court, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and whose conduct would not be justified under any set of circumstances, facts or assumptions,[4] *Wade v. Bethesda Hospital,* 337 F.Supp. 671, 673 (S.D.Ohio 1971). A § 1983 plaintiff should be allowed to prove his case when he alleges specific prosecutorial misdeeds which would permit either a court or jury to infer the existence of these necessary predicates to prosecutorial liability. We reach this conclusion in recognition of the above-recited evolution in the law and professional standards as well as in response to the need for a more positive means of compensating individuals for the deprivation of their civil rights.

In its most recent expression on the subject of official immunity, *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Supreme Court held that a school administrator forfeited his immunity and could be required to respond in damages to a § 1983 action if he "knew or reasonably should have known" that his conduct in expelling students violated their constitutional rights. See also *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). Here, we must assume from the pleadings that appellees knew, or as district attorneys should have known, that their statements to the press jeopar-

2. These Standards were adopted by the ABA House of Delegates in February 1968.

3. New York State adopted the Code of Professional Responsibility in 1970. Judiciary Law, McKinney's Supp.1975.

4. It is upon this final prong that the conduct of Merola and his co-defendants, if proven at trial, stands on different footing than that of the prosecutors in *Gregoire v. Biddle.* In *Gregoire,* a complaint was filed against two successive Attorneys-General of the United States and various subordinate federal officials, alleging that they had arrested and detained the plaintiff on the pretense that he was a German, and thus an enemy alien, despite the earlier ruling of an administrative hearing board that he was a Frenchman. Judge Learned Hand, writing for the court, held that the acts of the defendants were entitled to absolute immunity because they were within the scope of their respective offices. Had the plaintiff been a German—an imaginable assumption—the defendants would have been fully authorized and justified in behaving as they did. In contrast, no

set of facts or circumstances could possibly condone the pretrial release by a public prosecutor of the purported criminal affiliations of a criminal defendant. Such actions are beyond any reasonable construction of the proper exercise of the powers of the prosecutor's office.

The increasing concern with the possible damaging effects of prosecutorial statements which go beyond permissible limits is surely due in large part to the fact that today universal access to television cameras charges the memories of the viewers more forcibly and indelibly than other means of mass communication. While there is no evidence of any television broadcast in this case, it is common knowledge that such matter is frequently broadcast on many stations.

In any event, we disagree with those who may argue that *Gregoire v. Biddle* is authority for dismissing with prejudice actions such as this, as we believe in view of the developments since 1949, set forth above, that *Gregoire v. Biddle* no longer is controlling authority.

dized appellants' right to a fair trial. While we do not suggest that *Wood* controls the instant case, it does epitomize a trend to hold public officials accountable for their infringement of individual rights. See *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (Governor of Ohio and other state executive officials would be liable for damages in a § 1983 action if they acted in bad faith in ordering the National Guard to quell a student disturbance on a university campus, resulting in the death of three demonstrators).

In order to go forward with such a suit, however, the allegations should be specific as to what the prosecutor did so that it will be apparent from the face of the complaint that the actions complained of were improper and the injury suffered was of constitutional proportion.[5] The courts must guard against the initiation and prolongation of any litigation against prosecutors which might seriously hamper their effectiveness and delay the performance of their official duties.

█ It should not be enough, therefore, in § 1983 suits against prosecutors to make only general charges with no specifications such as might be sufficient under Rule 8 of the Federal Rules of Civil Procedure. *Fine v. City of New York*, 529 F.2d 70 (2d Cir. 1975); *Esser v. Weller*, 467 F.2d 949 (3d Cir. 1972). In the instant case, any generality in the plaintiffs' complaint was rectified by counsel's affidavit which annexed the newspaper clippings referred to in the court's opinion and the absence of any denial or explanation by the defendants.

█ We also note that it is nowhere alleged that the statements of the prosecutors regarding the connection of the plaintiffs with "crime families" are untrue. It is now enough to observe that truth should not be a defense to this cause of action, although, conceivably, it may later become relevant in mitigation of damages.

We believe the time has come for prosecutors to realize that failure to conduct themselves within the law and in accordance with the constitutional rights of those accused of crime, and held to be innocent until proven guilty, may subject them to suit in a federal court for the damages caused by their disregard of the law.

Judge GIBBONS concurs in this opinion.

GURFEIN, Circuit Judge (separate statement):

I am happy that the *per curiam* opinion ordering that the complaint be dismissed without prejudice under the comity doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), is unanimous. I am unhappy that I cannot join in the excellent homily of my colleagues on prosecutorial verbosity and its dangers. My reason is simple. In state-federal comity situations we abstain in large part because we do not wish to prejudice the merits in the state court. To abstain and to decide the merits at the same time may breed mischief.

Hence, while my brother Lumbard's zeal to right the wrongs of prosecutorial excess is entirely commendable and while I have watched with admiration for many years his dedicated service in the formulation of the ABA Standards Relating to the Prosecution Function and the Defense Function, I cannot agree that this is the time or place for an advisory opinion. Our refusal to affirm the dismissal on the merits should itself serve as a sufficient warning to prosecutors to be more circumspect in their public statements—indeed a worthy goal.

It is not desirable to decide a case before it is even brought. Having dismissed the complaint as premature, that is just the position we are in. We do not know what the new complaint will allege nor do we know whether damage will be shown. The factual averments in a future complaint may be quite different and will surely involve supervening circumstances, including whether "the improper conduct in fact had

---

5. Appellants have, at all times, been represented by counsel. The pleading requirements are considerably more relaxed for plaintiffs proceeding pro se. *Williams v. Vincent*, 508 F.2d 541, 543 (2d Cir. 1974).

[the] result" of violating the plaintiffs' Sixth and Fourteenth Amendment rights to their damage. See *Rosenberg v. Martin*, 478 F.2d 520, 525 (2 Cir.), *cert. denied*, 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973).

Having said that we should not say anything on the merits, I am myself somewhat in a dilemma. I can only work myself out of the dilemma by suggesting a series of questions to be strewn like broken glass on an otherwise seemingly smooth path.

Some of the more apparent questions are: (1) In the delicate area of prosecutorial immunity, will the wisdom of Judge Learned Hand in *Gregoire v. Biddle*, 177 F.2d 579 (2 Cir. 1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950), survive, or will *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), equally wise, be relevant to limit quasi-judicial *prosecutorial* immunity in civil rights "speech" cases? Is there really a discernible trend? (2) Since a private person may be a co-conspirator with a public official in violation of civil rights, see *Birnbaum v. Trussell*, 371 F.2d 672, 676 (2 Cir. 1966), will the newspapers which published the statements of the District Attorney be equally liable? What are the First Amendment implications? (3) If the unwarranted statement of a prosecutor subjects him to money damages on the ground that he has impaired the defendant's right to a fair trial *per se*, what shall we say when the defendant urges the same statement by the prosecutor as a *per se* ground for reversal or habeas corpus relief if he is convicted? Cf. *United States v. Pfingst*, 477 F.2d 177, 185 (2 Cir. 1973). Do we abandon the "totality of circumstances" test? See *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 60 (1966). (4) If the prosecutor makes the same outrageous statement in court on an arraignment, will he still be immune from suit like the judge? Or are we crossing new frontiers?

My only contribution to the discussion may be respectfully to suggest that there are no easy answers. I do not imply that my brothers think that the answers are easy, but in my view, our judicial history does not permit us to answer the hard ones until the time comes when we have no other principled choice.