**Arthur B. POWERS, Appellant,**

v.

**Glenn E. COE and Austin J. McGuigan, Appellees.**

**No. 137, Docket 83–7385.**

United States Court of Appeals, Second Circuit.

Argued Oct. 28, 1983.

Decided Feb. 10, 1984.

Timothy C. Moynahan, Moynahan & Ruskin, Waterbury, Conn., for appellant.

David S. Golub, Stamford, Conn. (Leora Herrmann, Silver, Golub & Sandak, Stamford, Conn., John M. Massameno, Wallingford, Conn., of counsel), for appellees.

Before OAKES, KEARSE and WINTER, Circuit Judges.

OAKES, Circuit Judge:

This appeal is by Arthur B. Powers, former Commissioner of the State of Connecticut Department of Transportation, from the dismissal of his civil action for damages under 42 U.S.C. § 1983. Powers sued Austin J. McGuigan, Chief State's Attorney for the State of Connecticut, and Assistant State's Attorney Glenn E. Coe,[1] McGuigan's former chief trial counsel, in connection with their initiation and conduct of a one-person grand jury investigation into the Connecticut Department of Transportation, and the subsequent prosecution of Powers. Numerous claims of deprivations of federal constitutional rights were made in Powers' complaint, stemming from alleged prosecutorial misconduct and vindictiveness, primarily involving alleged injuries to Powers' reputation, his ability to hold state office, and his right and capacity to defend himself from the charges. This section 1983 action, which was brought one day before Powers' criminal trial was to commence in state Superior Court, sought an injunction against the state proceedings as well as declaratory relief and damages. The United States District Court for the District of Connecticut, T.F. Gilroy Daly, Chief Judge, denied the injunction under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Approximately three weeks later the court granted the various state de-

---

1. The complaint was initially filed against McGuigan and three of his assistants in addition to Coe, as well as a state court judge. This appeal, however, involves only McGuigan and Coe.

fendants' motion to dismiss on the grounds that the complaint failed to state a claim upon which relief could be granted, Fed.R. Civ.P. 12(b)(6), and that in view of the disposition[2] of the state criminal proceedings, the complaint was moot. We affirm in part and reverse in part.

With the appeal in this posture, we are, of course, required to construe the allegations of the complaint in the light most favorable to the plaintiff, irrespective of whether recovery is remote or unlikely. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). We are well aware, as the appellees note, that many of the facts are in dispute, but following a dismissal for failure to state a claim we must look solely to the complaint. We note also that while the appellees' motion to dismiss and their accompanying papers related solely to Powers' claim for injunctive relief, the district court dismissed all of Powers' claims for relief, and that "the practice of dismissing claims 'on the basis of

the barebone pleadings is a precarious one with a high mortality rate.'" *Madison v. Purdy,* 410 F.2d 99, 100 (5th Cir.1969), citing *Barber v. M/V "Blue Cat",* 372 F.2d 626, 627 (5th Cir.1967).

## AGREED FACTS

For purposes of this appeal at least the parties seem to agree on certain facts. In September, 1981, Chief State's Attorney[3] McGuigan applied for the convening of a one-person grand jury[4] to investigate charges of corruption in Connecticut's Department of Transportation, and appointment of a person to conduct the grand jury was duly made. Powers was of course at that time Transportation Commissioner. Between September and December of 1981, Powers testified three times before the one-person grand jury. On October 23, 1981, on the occasion of Powers' second appearance, McGuigan agreed that if Powers resigned his office, he would not be prosecuted, with the proviso that no evidence subsequently

---

**2.** The state criminal proceedings ended with Powers' pleading guilty to two misdemeanors.

**3.** The Chief State's Attorney of Connecticut occupies a somewhat peculiar position, exercising powers in criminal matters similar in some respects to those of the attorney general in many states. Yet unlike most attorneys general, the Chief State's Attorney is appointed by the Chief Justice of the Supreme Court of the State rather than being elected. Also, he does not report to and is not accountable for his conduct to the Attorney General, the Governor, or any other elected official. He employs assistants who may be part-time or full-time and who may conduct trials. He and his deputy are empowered by statute to apply to the chief court administrator for an order that a criminal inquiry be made. If the chief court administrator is satisfied, the latter appoints a one-person grand jury, see note 4 *infra,* to conduct the inquiry "with the assistance of the chief state's attorney, deputy chief state's attorney or any state's attorney or assistant state's attorney." Conn.Gen.Stat. Ann. § 54–47(b) (1960).

**4.** Connecticut has an institution commonly known as a one-person grand jury. Conn.Gen. Stat.Ann. § 54–47 (1960). This institution has broad authority to inquire into crimes. *State v. Moynahan,* 164 Conn. 560, 564, 325 A.2d 199, 204, *cert. denied,* 414 U.S. 976, 94 S.Ct. 291, 38 L.Ed.2d 219 (1973). The judge or referee who is appointed to conduct an inquiry has no au-

thority to issue an information. Rather, his sole function is to investigate and to report his findings to the Superior Court which has appointed him. *In re Investigation of Grand Juror,* 188 Conn. 601, 604, 452 A.2d 935, 936 (1982). The one-person grand jury is thus simply an investigating body which neither tries, nor condemns, nor even accuses, but only inquires and reports, unlike the more familiar indicting grand jury. *Id.*

At the conclusion of an inquiry, which is marked by the filing of a report, the court then has the function of directing whether and to what extent the report shall be made available to the public or to interested parties. *Id.* 188 Conn. at 605, 452 A.2d at 936–37. Inquiries by the one-person grand jury are "conducted in public or private" as the appointing court or chief court administrator orders. Conn.Gen. Stat. § 54–47(c) (1960).

The appellant urges that the distinctly investigative nature of the Chief State's Attorney's job, as well as the purely investigative nature of the one-person grand jury, renders the application of the doctrine of prosecutorial immunity inappropriate. While we agree that the State's Attorneys exercise investigatory functions, it is clear that they also perform the functions traditionally associated with prosecutors—i.e., prosecuting. Our holdings with respect to the applicability of prosecutorial immunity in this case recognizes, we believe, the dual responsibility of the prosecuting attorneys.

uncovered showed that Powers had engaged in serious felonious conduct in the performance of his duties. Powers accordingly resigned as Commissioner on October 26, 1981.

In December, 1981, and January, 1982, Powers received certain telephone calls from one Joseph Hirsch pertaining to Hirsch's forthcoming appearances before the grand jury. Hirsch evidently was a contractor who did business with the Department of Transportation but he was also a close friend of Powers and the godfather of one of Powers' children. In any event, these telephone calls to Powers were, with Hirsch's consent, wiretapped and on the basis of what was said in those calls an information charging Powers essentially with obstruction of justice was filed on April 15, 1982. Powers was arrested on those charges that same day. Both the Connecticut printed press and television media carried stories on the entire Powers' matter from the beginning.

On October 4, 1982, Powers moved in state court to dismiss the information against him or in the alternative for an evidentiary hearing on the ground that the Chief State's Attorney had engaged in prosecutorial misconduct by leaking secret information from the one-person grand jury investigation to the media. These leaks, according to Powers, included accounts of his testimony and that of other witnesses before the grand jury, identification both of documents subpoenaed by the grand jury and of individual targets of the investigation, identification of the specific types of criminal conduct on which the grand jury was focusing, and reports of the daily activities of the investigators, as well as predictions as to future arrests. Powers' motions were denied without prejudice on October 6, 1982.

In November of 1982, the one-person grand jury was reconvened, and a substituted or superseding information charging Powers with four additional felonies was filed later that month. Powers' motion to dismiss or for an evidentiary hearing was renewed on December 14, 1982. Another

state court judge, succeeding upon the death of the original trial judge, denied this motion in January, 1983. Powers' appeal to the state Supreme Court was dismissed in March, 1983. The section 1983 complaint in the present action was filed in federal court on March 14, 1983, one day before trial began on the criminal charges in state court. Chief Judge Daly denied the prayer for injunctive relief, and trial commenced on schedule. On April 4, 1983, Powers pleaded guilty to two misdemeanor counts in the Connecticut Superior Court on a plea bargain under which the other charges were dropped. On April 18, 1983, the district court dismissed the complaint in this case, and it is from that dismissal that this appeal is taken.

## ADDITIONAL ALLEGATIONS TAKEN AS TRUE

Factual allegations of the complaint which, though disputed, we must take as true for purposes of this appeal are Powers' allegation that the Chief State's Attorney and his office leaked grand jury information to the press "maliciously and in bad faith in order to prejudice public opinion against [Powers], deprive [Powers] of his right to an unbiased jury and a fair trial, pressure [Powers] to plead guilty to the charges against him, and further [the Chief State's Attorney's] own political ambitions . . . ." Specifically, Powers identifies a *Hartford Courant* investigative reporter and a television news and anchor person in Hartford, as having privately met with the Chief State's Attorney at various times and places attested to by Powers' private investigators. Some sixty-nine articles published between September of 1981 through August of 1982, allegedly only a sample, are said to reveal secret information that was before the grand jury. The complaint also alleges that shortly after Powers filed his alternative motion either to dismiss or for an evidentiary hearing on October 4, 1982 (hereinafter "the Alternative Motion"), the Chief State's Attorney maliciously and in bad faith recommenced the dormant grand jury and misused it for discovery purposes with

regard to the outstanding information. The Chief State's Attorney is also alleged to have filed maliciously and in bad faith the substituted information charging Powers with four additional felony counts. In addition, the complaint alleges that the Chief State's Attorney fraudulently induced Powers to enter the agreement of October 23, 1981, which required Powers to resign as Commissioner, and that the Chief State's Attorney almost immediately undertook to breach that agreement.

The Chief State's Attorney breached his agreement with Powers, according to the complaint, by directing Joseph Hirsch repeatedly to engage Powers in wiretapped telephone conversations to create a charge of tampering, thereby permitting the State to disavow its agreement not to prosecute, and then by obtaining a ten-count information charging Powers with numerous crimes for which McGuigan had already agreed not to prosecute plaintiff. Powers alleges that in these wiretapped telephone conversations, Hirsch "importuned [Powers] to discuss [Powers'] grand jury testimony and to discuss Hirsch's forthcoming testimony with [Powers]", and that "[t]he sole purpose of these telephone calls was to fabricate a violation of the agreement between the State and [Powers], so that the state could claim that [Powers] breached the agreement." It is also alleged that on the occasion of Powers' first appearance before the one-person grand jury on September 25, 1981, the statement was made on the record that Powers was "a target" of the grand jury investigation.

Powers claims that at all times the Chief State's Attorney and the members of his office knew that Powers was represented by counsel and was a target of the grand jury. Nevertheless, on his account, they maliciously and in bad faith deprived him of effective assistance of counsel by using Hirsch in an attempt to induce the commission of criminal acts by Powers. It is also alleged that the Connecticut courts have absolutely denied Powers an evidentiary hearing on his claims of egregious prosecutorial misconduct so that he has no further recourse in the Connecticut courts. More-over, he claims he has been denied due process of law because the Connecticut Supreme Court, which appoints the Chief State's Attorney, cannot constitutionally review the acts of its own appointed prosecutorial official.

## ISSUES INVOLVED OR SAID TO BE INVOLVED

The parties do not agree as to the particular claims for relief presented by the wide-ranging complaint. Powers claims that by the systematic leaks to the press he was deprived of his rights to a fair trial, to fundamental fairness, and to due process. He also claims that the prosecutorial misconduct resulted in compensable damage to his reputation, and that the allegedly illegal wiretaps violated his Sixth and Fourteenth Amendment right to counsel and his Fifth Amendment right to due process. Powers also contends that the failure of the state courts to furnish him with an evidentiary hearing to prove the charges of prosecutorial misconduct made in his Alternative Motion, coupled with the failure of the Chief State's Attorney or his office to provide countervailing affidavits or evidence, violated due process. Finally, he alleges further denial of due process stemming from the Chief State's Attorney's breach of his agreement not to prosecute, and from the claimed misuse of the grand jury.

Not surprisingly, the appellees contend that none of Powers' allegations states a claim for which relief may be granted. They argue that the alleged deprivation of the right to a fair trial resulting from the alleged leaks was mooted by Powers' guilty plea. With respect to Powers' assertion that his reputation was injured by the prosecutors' unlawful conduct, the appellees cite *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), for the proposition that injury to reputation alone is not cognizable under the Constitution, and hence will not support a section 1983 claim. In response to Powers' charges arising out of the wire-taps, the appellees maintain that this conduct was lawful and that appellant's Sixth

Amendment claim is accordingly totally without merit. With respect to Powers' complaint that the state courts denied him an evidentiary hearing on his claim of prosecutorial misconduct, the appellees assert that there is no federal right to have a state judge act any particular way, and that there is no basis for holding prosecutors responsible for a court's holding. Finally, the appellees point to *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), and this court's *Taylor v. Kavanagh,* 640 F.2d 450 (2d Cir.1981), as authority for the proposition that the alleged breach of the agreement not to prosecute and the alleged abuse of the grand jury process are nonactionable under the doctrine of absolute prosecutorial immunity.

## DISCUSSION

### 1. *Mootness*

We turn first to a consideration of the question of mootness, since this appears to have been the basis of the decision below, and since the existence of a live case or controversy is, of course, a prerequisite to federal subject matter jurisdiction.

▪ As the Supreme Court unanimously held in a decision after the district court handed down its order under appeal in this case, a guilty plea in no way bars a section 1983 claim under principles of collateral estoppel, waiver, or mootness, where the alleged constitutional violations were not necessarily answered by the admission of guilt. *Haring v. Prosise,* —— U.S. ——, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983). In *Haring,* the plaintiff pleaded guilty to a charge of manufacturing a controlled substance, but subsequently brought a section 1983 action based on police officers' alleged illegal search of his apartment. The Supreme Court labeled the argument that the guilty plea should preclude litigation of the civil rights claims "anomalous" and stated that there was "no justification for creating such [a] ... rule." *Id.* at 2375. In the instant case, Powers' plea certainly did not, as a matter of logic, constitute admission that either the alleged leaks to the press or the alleged wiretaps were constitutionally

permissible since a "decision not to exercise [one's] right to stand trial cannot be regarded as a concession of any kind ...." *Id.* at 2376. As the Court said in *Haring,* "[w]hen a court accepts a defendant's guilty plea, there is no adjudication whatsoever of any issues that may subsequently be the basis of a § 1983 claim." *Id.* at 2377–78 n. 11.

▪ The appellees' mootness argument is, however, somewhat more sophisticated. Citing *Martin v. Merola,* 532 F.2d 191, 194 (2d Cir.1976) (per curiam), and *Kaylor v. Fields,* 661 F.2d 1177, 1181 (8th Cir.1981), they argue that until a section 1983 plaintiff has actually stood trial and the existence of prejudice been demonstrated, a claimed denial to the right of a fair trial based upon the prosecutor's statements to the press cannot be made; otherwise the damages are too speculative. Appellees quote *Rosenberg v. Martin,* 478 F.2d 520, 525 (2d Cir.), *cert. denied,* 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973), that "in order to recover damages for the deprivation of the right to a fair trial, a plaintiff must show not merely that the police engaged in [improper] conduct, 'which ... might have affected his right to a fair trial,' ... but that the improper conduct in fact had that result."

Although a fair trial section 1983 claim may be "unripe" if brought prior to an impending trial, that is not this case. Here, there was an actual trial terminated by a guilty plea, and Powers may well have pleaded guilty because he felt it was impossible, as a result of prosecutorial misconduct, to obtain an impartial jury—i.e., a fair trial. In light of *Haring* this is enough to state a section 1983 claim, however unlikely or implausible such a claim might be. Unlike the plaintiff in *Rosenberg,* there was no adjudication, state or federal, that Powers' trial was fair or his jury impartial, or on the merits of any of his constitutional claims. The state proceedings merely resulted in the acceptance of Powers' pleas of guilty to fewer and lesser offenses than those with which he had been charged. Thus, the damage claims are not moot even

though the right to injunctive relief is, of course, long since mooted and academic. *See McCabe v. Nassau County Medical Center,* 453 F.2d 698, 702 (2d Cir.1971).

## 2. *Prosecutorial Immunity*[5]

Essentially, Powers' complaint asserts that the defendant prosecutors engaged in five kinds of unlawful conduct. Powers maintains that this conduct gives rise to numerous section 1983 claims. While it is not always a simple matter to discern from Powers' papers how he purports to connect his version of the facts with his allegations of violations of his federal rights, his allegations as to what the defendants actually *did* are somewhat clearer. Powers asserts that defendants (1) leaked information to the media, (2) wiretapped his telephone calls, (3) breached an agreement not to prosecute, (4) entrapped him to commit new crimes, and (5) misused the grand jury.

It need hardly be said that we do not write on a clean slate. The leading Supreme Court case of *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), as set forth and applied in our own *Taylor v. Kavanagh,* 640 F.2d 450 (2d Cir. 1981), provides the framework for our analysis here.

In *Kavanagh* we quoted the *Imbler* holding that absolute immunity from section 1983 liability exists for those prosecutorial activities "intimately associated with the judicial phase of the criminal process . . .," 424 U.S. at 430, 96 S.Ct. at 994, and pointed out that "[t]hese protected 'quasi-judicial' activities, *Forsyth v. Kleindienst,* 599 F.2d 1203, 1214–15 (3d Cir.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981), include the initiation of a prosecution and the presentation of the Government's case." 640 F.2d at 452. We also noted the cases holding on the other hand that where prosecutors act in an "investigative" or an "administrative" capacity, only the qualified "good faith" immunity oper-

ates. *Id.* This functional approach to the immunity question, we said, "requires more than the mechanical application of labels." *Id.* "An examination of the functional nature of prosecutorial behavior" is determinative. *Id.*

■ A. *Press disclosures.* In light of these general principles, we hold here that only qualified good faith immunity is available where a prosecutor distributes extraneous statements to the press designed to gain unfair advantage at trial. *See Helstoski v. Goldstein,* 552 F.2d 564, 566 (3d Cir.1977); *Martin v. Merola,* 532 F.2d at 195–98 (Lumbard, J., concurring). To the degree that a prosecutor is called upon as part of his official duties to deal with the press, it would appear beyond cavil that such a duty would be administrative rather than "quasi-judicial," and hence not deserving of the cloak of absolute immunity.

■ B. *Wiretaps.* Nor do we feel that the question involved when a prosecutor engages in or authorizes and directs illegal wiretaps presents a close case, at least where the wiretapping is, as here, investigative in nature. There is really no dispute that the purpose of the wiretaps was simply to catch Powers. Hence, appellees are entitled to qualified, rather than absolute, immunity to claims flowing from this alleged wrongdoing. *See Forsyth v. Kleindienst,* 599 F.2d at 1215; *Jacobson v. Rose,* 592 F.2d 515, 524 (9th Cir.1978), *cert. denied,* 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979); *Guerro v. Mulhearn,* 498 F.2d 1249, 1256 (1st Cir.1974).

■ C. *Breach of promise.* The alleged breach of the agreement not to prosecute, while not technically a plea bargain which would render the prosecutor's immunity absolute under *Taylor v. Kavanagh,* 640 F.2d at 453, is so closely analogous to a plea bargain that we think the same principle of absolute immunity apply under the func-

---

**5.** Ordinarily, a court's analysis would first consider whether a claim is stated and only then look to the question whether a given defense to the claim applies. In the case of a defense of official immunity, however, since its applica-

tion is dependent on the conduct of the prosecutor rather than the form the legal claim against him assumes, the examination of the application of the defense first seems the more economical way to proceed.

tional analysis of *Kavanagh*. As we noted in that case:

> It is at this stage that the prosecutor evaluates the evidence before him, determines the strength of the Government's case, and considers the societal interest in disposing of the case by a negotiated guilty plea. The effective negotiation of guilty pleas would be severely chilled if a prosecutor were constantly concerned with the possibility of ruinous personal liability for judgments and decisions made at this critical stage of the criminal process.

640 F.2d at 453. Hence, we find that Powers may not recover damages for the alleged breach.

■ D. *"Entrapment" claim.* As we examine Powers' complaint, construing it in the light most favorable to him, it alleges that the State improperly entrapped him by directing Joseph Hirsch, whom Powers labels a government agent, "to repeatedly engage plaintiff in wire-tapped telephone conversations to create a charge of tampering, which would allow the State to disavow its agreement not to prosecute." Accepting these allegations as true, we hold such prosecutorial conduct to be absolutely immunized from suit.

To the extent that Powers' entrapment allegation simply restates his assertion that the prosecutors breached their agreement not to prosecute, it is, of course, nonactionable for precisely the same reasons. To the degree that Powers' entrapment and breach charges are distinct, the former amounts to little more than the assertion that the appellees decided to prosecute Powers without cause. If anything is clear in the law of immunity, it is that the prosecutor's decision—malicious or not, with cause or without—to prosecute must be absolutely immune from civil suit.[6] *See Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Yaselli v. Goff,* 12 F.2d 396 (2d Cir.1926), *aff'd,* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927).

■ E. *Misuse of grand jury.* We hold that the claimed misuse of the grand jury to obtain evidence against a person already accused is also absolutely immunized from suit. We are aware that a grand jury's function is to some degree investigative, that the Connecticut one-person grand jury is said to be exclusively investigative, and that the prosecutor's use and alleged abuse of the grand jury is also and necessarily at least partially investigative. But we are also mindful of the fact that neither *Imbler* nor *Kavanagh* purported to draw bright lines between quasi-judicial absolutely immune conduct, on the one hand, and investigative and administrative qualifiedly immune behavior, on the other. We believe that at the heart of the prosecutor's job is the decision whether to prosecute, and that the grand jury—even the Connecticut one-person grand jury—as an institution plays a central role in that decision-making process. *Imbler* held that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." 424 U.S. at 431, 96 S.Ct. at 995. The *Imbler* decision also recognized that "[p]reparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence." *Id.* at 431 n. 33, 96 S.Ct. at 995 n. 33. We have held today that when the "obtaining of evidence" is derived from illegal wiretaps, absolute immunity is inappropriate, because the prosecutor is acting essentially as a policeman. However, we also believe that a prosecutor must be permitted to work with a grand jury totally free of the threat of civil suit. Thus, all of Powers' claims which he derives from the alleged abuse of the grand jury are barred by absolute prosecutorial immunity.

### 3. *Powers' viable section 1983 claims*

We turn now to whether Powers' remaining claims, based upon the alleged leaks to the media and the alleged illegal wiretaps,

---

**6.** This is *not* to say, of course, that improper prosecutorial conduct may not result in dismissal of criminal charges, or a determination that a conviction was unlawfully obtained. *See, e.g., Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

state claims for which relief may be granted under 42 U.S.C. § 1983.

### A. Alleged systematic leaks of information to media.

■■■ 1. *Injury to reputation.* It is axiomatic that violations of state law alone are insufficient to state a claim for section 1983 relief. *See, e.g., Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). To the extent that appellant claims injury to his reputation resulting from the alleged grand jury leaks, appellees argue that *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), precludes recovery. *Cf. Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (no hearing required to allow appellant to clear his name from published charges of a stigmatizing nature when no allegation made that charges are false). We agree that the rule of *Paul* (subject to the *Codd* exception in the case of a protected property interest) is that injury caused by stigmatizing information furnished by a governmental agency is not as such cognizable under the due process clause, at least when there is no allegation that the information is false. Because Powers' complaint nowhere alleges that the leaked information was false, his allegations of injury to reputation do not state a claim.

2. *Deprivation of fair trial.* Powers' complaint also alleges that the systematic leaks by the prosecutors to the press deprived him of a fair trial. As noted above, this claim was clearly not mooted, and we hold that Powers is entitled to the opportunity to show that his constitutional right to a fair trial was violated by the alleged leaks.

We wish to emphasize, however, that our holding in no way diminishes the burden that the plaintiff must meet in order to prove his allegations. In the first place there must be a showing that (A) in the pre-arrest or information stage there were extrajudicial statements for public communication going beyond the public record and unnecessary to inform the public that investigation was under way or going beyond a mere description of the general scope of the investigation or (B) in the post-arrest or information stage such statements relating to (1) the prior criminal record or character or reputation of Powers, (2) the existence and content of any admission or statement of Powers or the refusal or failure of Powers to make any statement, (3) the identity, testimony, or credibility of prospective witnesses, (4) the guilt or innocence of Powers or other matters relating to the merits of the case or the evidence in the case, or (5) other matter improper within the canons of ethics and standards relating to prosecutorial functions and fair trial/free press. In other words, there must be improper "leaks."

Second, Powers' claim that he was denied a fair trial "requires more than the mere speculation of damages . . .[;] it requires a showing that plaintiff [has] *in fact* been denied [his] due process rights." *Martin v. Merola,* 532 F.2d at 194 (emphasis added). Although the guilty plea did not moot Powers' claim, it may well have made his task of proving it more difficult. It is for counsel, however, and not for us, to determine how to prove the elements of the claim.

Moreover, the showing that must be made involves more than a showing that there were improper leaks and that there was deprivation of a fair trial. While there need not be a showing that the defendant(s) herein knew that the leaks would tend to cause such a deprivation or intentionally gave them to the media, *Parratt v. Taylor,* 451 U.S. 527, 534–35, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981), there must be a showing that other remedies were not available, or were used to no avail, to alleviate the effects of the leaks, e.g., a thorough voir dire, utilization of challenges both peremptory and for cause, a motion to disqualify a biased judge (we do not suggest that there was such in this case), a motion to change venue, or the like. In other words, there must be a showing of causation; if Powers was deprived of a fair trial he has to show that such deprivation was not "too remote a consequence" of the improper leaks to the press. *See Martinez v. Califor-*

*nia,* 444 U.S. 277, 279, 285, 100 S.Ct. 553, 556, 559, 62 L.Ed.2d 481 (1980). And anything we have said, of course, does not foreclose, on appropriate papers, summary judgment.

B. *Alleged illegal wiretaps and use of an informer.*

■ 1. *Sixth Amendment claim.* Powers raises a number of Sixth Amendment claims relating to the allegedly illegal wiretaps and the use of the alleged informer, Hirsch. Powers asserts that this prosecutorial conduct was designed to "circumvent" his counsel in violation of his Sixth and Fourteenth Amendment rights. The appellees rely heavily on *United States v. Vasquez,* 675 F.2d 16 (2d Cir.1982), where we held that it was not in violation of the Sixth Amendment right to counsel to make a tape recording of a conversation the defendant had with a government informant, even where the defendant had already retained counsel and where the defendant was already the subject of an investigation. Following *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), and citing *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977), we noted in *Vasquez* that the Sixth Amendment right to counsel does not attach until adversarial proceedings have commenced. Thus, both *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), each involving a post-indictment confrontation between government agents and the accused, are distinguishable from *Vasquez* as well as from this case. Under *Vasquez,* then, even though Powers was a target of the grand jury and had retained counsel, the allegedly illegal wiretaps do not form the basis for an action under section 1983 alleging violations of his Sixth Amendment rights.

2. *Fifth Amendment claim.* Irrespective of his Sixth Amendment right, Powers maintains that the wiretaps deprived him of his Fifth Amendment right to due process under the decision in *United States v. Tar-*

*lowski,* 305 F.Supp. 112 (E.D.N.Y.1969). In *Tarlowski,* now Chief Judge Weinstein of the Eastern District of New York granted a motion to suppress certain statements and records obtained from a taxpayer during the course of an investigation by a Internal Revenue Service Special Agent in which the agent deluded the defendant into thinking that he was merely negotiating a civil claim and then, having excluded the taxpayer's accountant, proceeded to state to him his *Miranda* rights and solicit the statements in question. The instant case is said by Powers to be far more egregious than *Tarlowski* because at least in *Tarlowski* the IRS agents were known to be such while here Powers thought he was dealing with his old friend and the godfather to one of his children.

■ But the questions presented by *Tarlowski* were altogether different from those involved here. In *Tarlowski* the court considered whether "a representative of the federal government [may], at his own behest, limit the right of an individual to demand the presence of others at an investigation." *Id.* at 116. Carefully framing the issue, Judge Weinstein asked whether "such a [government] representative, contemplating a criminal prosecution, [may] demand the presence of an individual for questioning, but, at the same time, refuse that person the right to be accompanied by another in whom he reposes trust and confidence?" *Id.* In answering both of these questions in the negative, Judge Weinstein stressed that the action taken by the government agent was *totally unauthorized* by statute, *id.* at 123, and noted the necessarily coercive and intimidating nature of the face-to-face demand by the government agent. *Id.* at 124. The case, decided in 1969 and, as far as we know, never followed, is thus entirely distinguishable from the case at bar. Moreover, *Tarlowski* was not a section 1983 case, and involved only the question of the admissibility of evidence.

We are, accordingly, unpersuaded that the allegedly unlawful wiretapping violated Powers' Fifth Amendment rights. Not ev-

ery misdeed constitutes a due process claim, and we are unaware of any authority or reasoning sufficient to transform this alleged transgression into a constitutional case.

 C. *Alleged state court violation of due process.* With respect to the allegations pertaining to Powers' failure to obtain an evidentiary hearing in the state courts, we note that no appeal is taken from the dismissal as to the original state judges who were defendants. All that the Chief State's Attorney's office is accused of doing is failing to file a single affidavit in opposition to Powers' motion. Surely, this does not involve any federal right that could conceivably result in a section 1983 violation. The objection to the process whereby the chief prosecuting officer is appointed by the state Supreme Court and is neither elected nor responsible to an elected official is hence not an issue before us. Accordingly, we say only that Powers clearly cannot recover damages from the state prosecutors for an allegedly erroneous ruling by the trial court. *See Siano v. Justices of Massachusetts,* 698 F.2d 52, 56 (1st Cir.1983), *appeal docketed,* — U.S. ——, 104 S.Ct. 80, 78 L.Ed.2d 91.

### CONCLUSION

To summarize, we hold the following:

1. None of Powers' claims are mooted by his guilty plea.

2. Powers' claim for injuries relating to alleged prosecutorial leaking of secret information to the media may state a claim under section 1983 if it is demonstrated that Powers would have been deprived or was in fact deprived of a fair trial so that he pleaded guilty in substantial part because of such deprivation. This claim is, however, subject to a qualified immunity defense.

3. The claims relating to the alleged illegal wiretaps are not actionable.

4. No claim is stated against these appellees for failure to obtain an evidentiary hearing in the state courts or for "entrapment," or for breach of an agreement not to prosecute, or for misuse of the state grand jury by obtaining evidence against a person already accused.

5. Nothing said in this opinion goes to the question of summary judgment on a more fully developed record.

Judgment affirmed in part, reversed in part; cause remanded for further proceedings in accordance with the foregoing. Costs to neither party.